ENGINEERED TIMBER SALES, INCORPORATED, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10262–77.    Filed July 22, 1980.

---

*Sherwin P. Simmons* and *William Kalish,* for the petitioner.
*Roger D. Osburn,* for the respondent.

Scott, *Judge:* Respondent determined deficiencies in petitioner corporation's income taxes for calendar years 1974 and 1975 in the amounts of $7,739.04 and $363.39, respectively.

Some of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision (1) whether in the year 1974 petitioner established a profit-sharing plan within the meaning of section 401(a), I.R.C. 1954,[1] so as to be entitled to deduct, under section 404(a), contributions made in that year to an exempt trust; and (2) in the alternative, whether petitioner is entitled to deduct in 1974, under section 404(a), a contribution made on behalf of its employees to a nonexempt profit-sharing trust.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Engineered Timber Sales, Inc. (ETS), a closely held corporation, was incorporated in Florida on December 7, 1967. Its principal place of business at the time of filing its petition in this case was Tampa, Fla. As a cash basis taxpayer, petitioner timely filed its Federal income tax return for each of the calendar years 1974 and 1975 with the Internal Revenue Service Center, Chamblee, Ga.

Throughout 1974 and 1975, John B. Pugh and his wife, Jane N. Pugh, each owned 50 percent of the outstanding capital stock of ETS. Mr. and Mrs. Pugh were the sole members of the ETS board of directors, and as corporate officers, Mr. and Mrs. Pugh served as president and secretary-treasurer, respectively.

The primary business activities of ETS are the retail sale to, and installation for, commercial customers of such wood products as heavy timber beams and wood roof decking. Generally, products are installed at a jobsite by laborers subcontracted for

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the years in issue.

the specific project. These workers are supervised by the ETS full-time, permanent employees. This operation limits the need for a large staff of ETS full-time employees.

On December 30, 1974, ETS employed five full-time workers. At that time, Mr. Pugh, who had 7 years of service with ETS, was responsible for ETS sales and the securing and supervising of all subcontract agreements and laborers. Mrs. Pugh, who had worked for ETS 5 years prior to December 30, 1974, was responsible for the fiscal operations of ETS, including establishing credit lines, collecting and disbursing funds, assisting in project bidding, purchasing materials, scheduling employees on projects, and maintaining the general personnel and payroll records. Estle A. Tate, employed by petitioner beginning January 24, 1974, was a foreman and additionally performed carpentry work at jobsites. James R. Patterson, employed by ETS commencing June 4, 1974, was the ETS project manager, responsible for assuring the availability of supplies and materials at jobsites. Bill Clark, a college student, commenced employment with ETS on October 8, 1974, as a part-time shop laborer during academic semesters and full time during school vacations, including his Christmas holiday. Messrs. Tate, Patterson, and Clark were unrelated to one another or to Mr. and Mrs. Pugh.

On December 5, 1974, Mr. and Mrs. Pugh met with petitioner's accountant, Mr. Hurst, in order to preliminarily review the corporation's tax position for 1974. During that meeting, they asked Mr. Hurst about some form of profit-sharing plan, and he recommended that Mr. and Mrs. Pugh consider instituting a profit-sharing plan effective in 1974 on behalf of the ETS full-time employees. After advising Mr. and Mrs. Pugh that ETS probably could establish a profit-sharing plan qualified under the Internal Revenue Code, Mr. Hurst suggested that Mr. and Mrs. Pugh contact an attorney for detailed advice and the drafting of necessary documents.

On December 10, 1974, Mrs. Pugh conferred with an attorney (who was not an attorney representing petitioner in this case) concerning the possibility of creating some type of retirement plan qualifying under the Internal Revenue Code for ETS full-time employees. This attorney reviewed with Mrs. Pugh the basic provisions of defined benefit and money purchase pension plans and discussed the requirements of a qualified profit-

sharing plan. The attorney indicated alternative eligibility provisions, vesting schedules, potential trustees, and contribution schemes. Mrs. Pugh and the attorney each wrote notes during the discussion of matters covered. Upon completion of the December 10 meeting, the attorney used his handwritten notes as a guide to dictate a memorandum to his file concerning his discussion with Mrs. Pugh. The attorney's secretary typed that memorandum, dated December 10, 1974, which states in pertinent part:

> At the beginning of the conference, I asked Mrs. Pugh how many employees were involved in the corporation and what she expected [the number] to be for the year. At the present time, there are three employees including Mr. and Mrs. Pugh. The third employee has been with them for something less than a year. The other employees of the company are hired for particular jobs and apparently a number of people are hired during the summer to work on particular projects. I explained to Mrs. Pugh that under the new law, if an individual worked more than 1000 hours during a twelve month period he had to be considered as a full-time employee for purposes of any qualified benefit plan. She indicated that all of their employees were paid on an hourly basis and that it would be easy for them to determine whether or not the employee had worked more than 1000 hours. She indicated that she did not believe that any of the part-time employees would meet the 1000 hour requirement.

> \*     \*     \*     \*     \*     \*     \*

> On the profit-sharing plan, I explained to her that the company's contribution could be left to the complete discretion of the Board of Directors. The amount of the contribution varying from zero to 15% of the participating employees compensation to the extent that the company had either current or accumulated profit.

> We also reviewed the alternatives for the eligibility provisions, vesting schedule and employee voluntary contributions. On the eligibility provisions, I pointed out that the plan could provide that the employee would become eligible to participate when he or she reached 25 and/or had completed one year of service. On the vesting schedule, I explained to Mrs. Pugh the three alternative maximum vesting schedules contained in the new pension bill. However, I pointed out to her that in light of the small number of employees involved in their plan, it would probably be impossible to get a vesting schedule longer than two or three years. I pointed out to her that the reason for the rapid vesting requirement was to avoid their using the plan for their exclusive benefit by dismissing the employees before they had obtained any significant vesting.

> In the area of trustees, I suggested that Mr. and Mrs. Pugh consider the possibility of having a bank act as the trustee of their plan. The purpose of this would be to relieve them of the responsibility and obligations connected with being trustee. I checked with the First National Bank and informed Mrs. Pugh that they would charge a flat fee of $250 if the funds were invested in their employee benefits co-mingle trust fund and $500 if the funds were invested in

any other type of investment. She said that she would discuss the matter with her husband and that they would probably want to get together with representative of the various banks before they reached a decision on this matter.

I told her that we would be able to prepare a trust agreement to get the fund started this year, but that we felt that it would be advisable to defer drawing the plan until such time as the regulations were issued under the Pension Bill and we had an understanding of what would be required by those regulations.

Based upon their current salary schedule, it appears that they could contribute approximately $14,000 to the trust this year assuming they used the full 15%. Mrs. Pugh indicated that this amount would not present any problem with their cash flow or profit position.

[Reproduced literally.]

On December 10 and 11, 1974, Mrs. Pugh discussed with Mr. Pugh what had transpired at her meeting with the attorney. Mrs. Pugh used the notes she had written during her December 10, 1974, conference to guide her discussion.[2] Mr. and Mrs. Pugh

---

[2]The notes in full were as follows:

1000 hrs = full time     must be covered
eligibility provision
   25 yrs      1 yr service
terminated by last day of yr
two
         fixed benefit
   1. pension —guarantee pension     % of comp

     age comp actuarily     fixed contribution
     Money purchase
     contribution     % of each employees
         comp up to 25%
     % fixed
     Benefit     money built up with purchase
   2. profit sharing
     employees
     decide amt to contribute each year
     0–15% of emp compensation
     employee — retires     takes 1/2 benefits
   employee make voluntary
     up to 10% of comp
  Mandatory or     net compensation
   voluntary
Max vest permitted     10 yrs — 10%
  rule 45 — age + yrs = 45     must be 50% vested
         10% thereafter
  rule 15 — 15%/yr     1st 10 yrs — 10% after
         vesting
  optional 55
Retire — die — disability — quit

determined that ETS should create a profit-sharing plan and telephoned the attorney on December 12 or 13, 1974, to inform him of that decision. During that telephone conversation, the attorney reviewed the requirements of a qualified profit-sharing plan. The attorney proposed plan requirements, including: eligibility upon attainment of age 25 and 1-year minimum service to ETS equivalent to 1,000 working hours, plan entry dates for eligible employees of June 30 and December 31 of each year, a 5-year vesting schedule at 20 percent per year, annual contribution requirements for ETS of zero to 15 percent, and the possibility of voluntary contributions by employees. Also, the attorney related the elements for the proper administration of a plan, including the events that would trigger the availability of benefits to plan participants. At the end of the telephone conversation, the attorney arranged for a December 20, 1974, conference for the purposes of personally meeting Mr. Pugh and further consideration of topics discussed on the telephone.

On December 20, 1974, Mr. and Mrs. Pugh met at their office with the attorney. As in the prior conference, the attorney took handwritten notes.[3] Mr. and Mrs. Pugh informed the attorney

---

no estate tax on proceeds

```
                  and or
eligibility — 25/ 1 yr svc
                  5 yr vest schedule
voluntary cont        10% of gross        Min $50
co complete flex       0–15% — gross salary

               we be
write trust — trustees — Bank act as trustee
   individual Bonded 10%
First Ntl     Exchange    Marine       all bac
most          complete    2 complete
                          changes
stability                              vesting
                                       Bond
                                       Bank acct
cash          CD         Comm paper    if corp ceases before
                                       everyone vested
   $1000 — 1500 –                      Trust
doc                                      $250/yr
                                       Comm $500
qualification                          stock
```

[3]The attorney's notes taken during the Dec. 20, 1974, meeting state in full:

Al S. Lucarelli
Call Arthur Young — re the status of the plan — individual trustee — existence of the plan

that rather than select a bank to serve as trustee over the profit-sharing trust, they had decided that one or more individuals should serve as plan trustees. Mr. and Mrs. Pugh related that for plan year 1974, ETS could contribute up to 15 percent of each eligible employee's salary to the plan trust. After the Pughs asked the attorney to prepare the documents necessary to qualify the ETS plan under the Internal Revenue Code, the attorney advised Mr. and Mrs. Pugh that he would draw up a formal trust instrument. However, the attorney suggested that the writing of a formal plan document be deferred until the Internal Revenue Service issued rules or regulations clarifying the application of the Employee Retirement Income Security Act of 1974, Pub. L. 93–406, 88 Stat. 829 (ERISA), to a plan adopted in December 1974 with effective date retroactive to January 1974. During the December 20 meeting, the attorney instructed Mr. and Mrs. Pugh to establish before yearend 1974 a bank account to which ETS could contribute a sum of 15 percent of the annual salaries of all employees who were eligible for participation in a profit-sharing plan.

Thereafter, the attorney drafted a formal trust agreement, a document entitled "Written Action of the Board of Directors of

---

filing reports
eligibility — 25 — 1 year
vesting rules — 5 years
Buy sell — Med Pay
Valuation of closely held business

Mrs. Pugh also took notes at this meeting which are in full:

2500                                   4000
vesting                                     Jan 1000 Dec
1000 hrs./
when does vest ann date — end yr
when do pay off if quits — immediately
steal, alc,                             July —
change to personal holding co. —
what happens to plan         can we draw
some active bus. no effect
reason for cancelling plan

decline profits         because no profit
shift to pers. hold Co.
union comes in
do not want to make contri any longer
Payout      lump sum
annuity                 trustees
trust pay out           decision

Engineered Timber Sales, Inc." (written action of the board), and a notice to ETS employees of the adoption of a plan. Those documents became available to petitioner's board of directors on December 30, 1974. On that date, as indicated by the written action of the board, the board of directors adopted a formal trust agreement and stated its intent to create a profit-sharing plan qualifying under the Internal Revenue Code:

WHEREAS, the Board of Directors of this corporation has determined that it is in the best interests of the corporation and its employees that a profit sharing plan be established immediately, effective for the entire fiscal year ending December 31, 1974; and,

WHEREAS, it is desirable that the plan qualify under Section 401 of the Internal Revenue Code of 1954, as amended; and

WHEREAS, it is not practical at this time to adopt the specific terms of the plan because of the recent passage of the Employee Retirement Income Security Act of 1974 (the "Act"), but it is the intention of this Board, here formalized, to adopt a specific plan as soon as possible after analyzing the Act; and,

WHEREAS, it is desirable that a contribution be made on behalf of the corporation's employees to a trust that will qualify as an exempt trust under Section 501 of the Internal Revenue Code of 1954, as amended, such contribution to be deemed made under the terms of the plan to be adopted as soon as practical;

NOW, THEREFORE, BE IT RESOLVED by the Board of Directors of this corporation that the Engineered Timber Sales, Inc. Profit Sharing Trust attached hereto as Exhibit "A" is hereby adopted in its entirety, and the officers are hereby authorized and directed to execute this Trust and effect its acceptance by the named Trustees.

BE IT FURTHER RESOLVED, that the officers be, and they hereby are, authorized and directed to make an initial contribution to the Trust of $16,123.00.

BE IT FURTHER RESOLVED, that the officers be, and they hereby are, authorized and directed to establish the Trust and make the aforesaid contribution as soon as practical.

BE IT FURTHER RESOLVED, that the officers be, and they hereby are, authorized and directed to inform the employees of this corporation of the establishment of the Trust, the amount of the contribution for this fiscal year ending December 31, 1974, and the intention of this corporation to adopt the specific terms of the plan as soon as practical after analysis of the Act.

Pursuant to the authorization for an ETS contribution to the trust of $16,123, on December 31, 1974, a check was drawn on petitioner's operations account for that amount to the Northside Bank of Tampa (properly known as the Landmark Bank of Tampa). Schedule A appended to the trust document named Mr.

and Mrs. Pugh as trustees, and in handwriting thereafter, stated "$16,123.00 cash."[4]

Prior to December 25, 1974, Mr. and Mrs. Pugh orally informed several other ETS employees of the company's intent to adopt a profit-sharing program. To accomplish this, both Mr. and Mrs. Pugh spoke with Mr. Tate in their office, while Mr. Pugh alone talked with Mr. Patterson. The discussion with each employee related some details as to the plan's operation, benefit-triggering events, and information on eligibility and vesting. The only written confirmation available to the employees on an ETS profit-sharing program was the 1-page employee notice drafted by the attorney.[5] Either in late December 1974 or during

---

[4]The trust agreement reads in pertinent part:

THIS AGREEMENT AND DECLARATION OF TRUST, hereinafter called the "Agreement", made and entered into this ___ day of December, 1974, by and between ENGINEERED TIMBER SALES, INC. (hereinafter called the "Employer"), and JOHN B. PUGH and JANE N. PUGH (hereinafter collectively called the "Trustee").

WITNESSETH:

WHEREAS, the Employer intends to adopt a Profit Sharing Plan for the benefit of its employees; and

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

ARTICLE VIII
*Amendment and Termination*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(d) Notwithstanding the provisions of paragraph (b) above, if the Employer is unable to secure on or before December 31, 1975, the initial approval of the Trust by the Commissioner of Internal Revenue, or his duly authorized representative, as a qualified tax-free employees' trust under the Internal Revenue Code of 1954, as amended, then and in that event, the Trust shall terminate as of 6:00 P.M. on December 31, 1975, and the Administrative Committee shall direct the Trustee to pay the then aggregate of the balances in Accounts A to the Employer; and, the balance in a Participant's Account B shall be paid to such Participant, the Participants and their beneficiaries shall have no further rights under this Plan, the Trust, or in the Trust Fund, and the Trustee shall be discharged of all obligations and duties under the Trust.

It was signed by Mr. Pugh on behalf of petitioner and by both Mr. and Mrs. Pugh as trustees.

[5]The notice posted by petitioner announcing the adoption of an employee profit-sharing plan states:

ENGINEERED TIMBER SALES, INC.

TO ALL EMPLOYEES:

On the December 30, 1974, ENGINEERED TIMBER SALES, INC. established a Profit Sharing Plan and Trust for the benefit of its employees.

Every employee who has been employed by Engineered Timber Sales, Inc. for one year and has attained the age of 25 years on December 31, 1974, is eligible to become a participant in the Plan and share in the benefits provided by the Plan. Thereafter, on the 30th day of June and the 31st day of December of each year, non-participants who have been employees of the company for one year and have attained the age of 25 years will be eligible to become participants in the Plan.

Upon receiving the approval of the Plan and Trust from the Internal Revenue Service, full details of the Plan and Trust will be furnished to each participant by the Plan Administrator.

the first 2 months of 1975, this bulletin was posted on the company toolshed, the customary spot for posting such announcements.

On February 18, 1975, the attorney submitted a profit-sharing plan instrument to the ETS board of directors for approval. The board members approved and executed the plan document on April 15, 1975, which called for retroactive "effective[ness] for all purposes as of the 31st day of December, 1974."

On March 7, 1975, petitioner filed, with the Internal Revenue Service, Form 4848 (Annual Employer's Return for Employees' Pension or Profit-Sharing Plans) and Form 4849 (Financial Statement of Employees' Pension or Profit-Sharing Fund or Fiduciary Account) for 1974. Petitioner also filed on June 28, 1975, with the Internal Revenue Service, an application for determination to secure approval of its profit-sharing program as a qualified tax-free employee benefit plan and trust. Moreover, pursuant to the disclosure and reporting provisions of title I of ERISA, on August 27, 1975, petitioner filed with the Department of Labor "Plan Description" Form EBS–1, which shows January 1, 1974, as the initial effective date and indicates that employer contributions will be determined annually by the board of directors.

On August 3, 1976, the ETS board of directors adopted a "First Amendment in the Nature of Substitution to Engineered Timber Sales, Inc. Profit Sharing Plan" and a "First Amendment in the Nature of Substitution to Engineered Timber Sales, Inc. Profit Sharing Trust." Written action of the board of directors also dated August 3, 1976, states the following:

WHEREAS, on December 30, 1974, the Board of Directors authorized the establishment of a profit sharing plan and trust for the benefit of the employees of the corporation; and

WHEREAS, it is the corporation's desire that the Plan continue to qualify under sec. 401 of the Internal Revenue Code of 1954, as amended, and that the

---

In the meantime, the Plan Administrator, upon request of the participant, will make a copy of the Plan and Trust available to such participant for review.

ENGINEERED TIMBER SALES, INC.

(S) John B. Pugh

JOHN B. PUGH, *President*

Trust continue to qualify as an exempt trust under sec. 501 of the Internal Revenue Code of 1954, as amended; and

WHEREAS, the Board of Directors have been advised that certain amendments will be required to be made in the Engineered Timber Sales, Inc. Profit Sharing Plan and Trust in order to bring them into compliance with the provisions of the law governing qualified pension and profit sharing plans as amended by the Employee Retirement Income Security Act of 1974; and

WHEREAS, after reviewing the amendment that will be required in the profit sharing plan and trust, the Board of Directors have determined that it would be advisable and in the best interest of the corporation and its employees to amend the Plan and Trust by substituting an entirely new plan and trust for the existing Plan and Trust.

Now, THEREFORE, BE IT RESOLVED by the Board of Directors that the First Amendment in the Nature of a Substitute to the Engineered Timber Sales, Inc. Profit Sharing Plan and the First Amendment in the Nature of a Substitute to the Engineered Timber Sales, Inc. Profit Sharing Trust be, and they hereby are, adopted and approved in their entirety effective January 1, 1975, said Amendments to be in substantially the same form as those attached hereto as Exhibits A and B, respectively.

BE IT FURTHER RESOLVED by the Board of Directors that the appropriate officers be, and they hereby are, authorized and directed to execute said Amendments on behalf of the corporation.

In response to petitioner's Application for Determination for tax-exempt status for taxable year 1974 of its profit-sharing program, the Internal Revenue Service issued its Final Adverse Determination Letter on August 27, 1976. Denial of tax-exempt status was based upon the following reason stated in the Final Adverse Determination Letter:

The plan was not a definite written program properly communicated to employees in 1974, in that, it was not adopted until April 15, 1975, 3½ months after the end of the taxable year.

The provisions of section 401(b) of the Code do not apply to situations involving the existence of a plan * * *

Thereafter, on December 31, 1976, petitioner filed, with the Internal Revenue Service, an application for determination for defined contribution plan with respect to the "First Amendment in the Nature of Substitution to the ETS Profit-Sharing Plan and Trust." By letter dated May 9, 1977, the Internal Revenue Service issued a favorable determination on the amended profit-sharing program for tax years commencing after December 31, 1974.

At the end of each year, Mr. Tate has received a letter from petitioner concerning the profit-sharing program. The corre-

spondence has indicated the amount of benefits available to Mr. Tate at those times.

In its Federal income tax return for 1974, ETS deducted $16,123 as a contribution to its profit-sharing trust. In his notice of deficiency, respondent disallowed the claimed $16,123 deduction and explained that—

(a)(I) The deduction claimed for contributions to your profit-sharing plan for the taxable year ended December 31, 1974 in the amount of $16,123.00 is not allowed because it has been determined that your profit-sharing plan does not qualify under Section 401(a) of the Internal Revenue Code of 1954 and no deduction is allowable under Section 404(a) of the Internal Revenue Code of 1954. Therefore, your taxable income is increased in the amount of $16,123.00.

## OPINION

Section 404(a)(3) permits an employer who, on behalf of its employees, contributes not more than 15 percent of all other compensation paid or accrued to its employees in the tax year to a profit-sharing trust, which qualifies for exemption from taxation under section 501(a), to deduct these contributions on its Federal income tax return. Section 501(a) provides that such a deferred benefit trust shall be entitled to tax-exempt treatment if it meets the provisions of section 401(a) or section 501(c)(17)(A), the latter of which is not here applicable. To qualify under section 401(a), a deferred benefit trust must meet certain broad, general requirements, including that it form a portion of "a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries."

Petitioner takes the position that it is entitled to deduct the contribution it made in 1974 to the trust created in that year since, in its view, it established a profit-sharing plan within the meaning of section 401(a) in the year 1974. Respondent takes the position that petitioner did not establish such a plan in 1974 but merely formed the intent in that year to establish such a plan at a later date. In December 1974, petitioner's board of directors commenced consideration of creating an employee retirement plan. Mr. and Mrs. Pugh, the sole members of the ETS board of directors and each a 50-percent ETS shareholder, in early December, conferred with petitioner's accountant, Mr. Hurst. He recommended that the company rapidly arrange for a deferred compensation plan effective for the 1974 tax year. Soon thereafter, Mrs. Pugh made an appointment for December 10,

1974, with the ETS attorney. On that date, Mrs. Pugh met with the attorney and discussed the requirements of a qualified retirement plan. During the conference, Mrs. Pugh and the attorney each took handwritten notes. During the afternoon of December 10, the attorney dictated from his notes and had his secretary type a memorandum reviewing the highlights of his discussion with Mrs. Pugh. Mrs. Pugh discussed the meeting with Mr. Pugh, and on December 12 or 13, 1974, they conversed on the telephone with the attorney. At a meeting held in petitioner's offices on December 20, 1974, Mr. Pugh, Mrs. Pugh, and the attorney further discussed the creation of an ETS profit-sharing plan. During that conference, the attorney made some handwritten notes. At that time, Mr. and Mrs. Pugh instructed the attorney to prepare those documents necessary to create a qualified profit-sharing plan and trust effective for tax year 1974. The attorney advised Mr. and Mrs. Pugh to defer the writing of a plan instrument until the Internal Revenue Service clarified the requirements of ERISA, which had become effective on September 2, 1974. Accordingly, although the attorney did not draft a formal plan document, he drafted a formal trust instrument, a document entitled "Written Action of the Board of Directors of Engineered Timber Sales, Inc.," and a notice to employees. On December 30, 1974, the board of directors adopted and executed the former two writings.

In addition to his contention that no profit-sharing plan was adopted by petitioner before the end of 1974, citing section 1.401–1(a)(2), Income Tax Regs.,[6] respondent asserts, in the

---

[6]Sec. 1.401–1, Income Tax Regs., provides in part:

Sec. 1.401–1 Qualified pension, profit-sharing, and stock bonus plans.

(a) *Introduction.* (1) Sections 401 through 405 relate to pension, profit-sharing, stock bonus, and annuity plans, compensation paid under a deferred-payment plan, and bond purchase plans. Section 401(a) prescribes the requirements which must be met for qualification of a trust forming part of a pension, profit-sharing, or stock bonus plan.

(2) A qualified pension, profit-sharing, or stock bonus plan is a definite written program and arrangement which is communicated to the employees and which is established and maintained by an employer—

\* \* \* \* \* \* \*

(3) In order for a trust forming part of a pension, profit-sharing, or stock bonus plan to constitute a qualified trust under section 401(a), the following tests must be met:

(i) It must be created or organized in the United States, as defined in section 7701(a)(9), and it must be maintained at all times as a domestic trust in the United States;

(ii) It must be part of a pension, profit-sharing, or stock bonus plan established by an employer for the exclusive benefit of his employees or their beneficiaries (see paragraph (b)(2) through (5) of this section);

alternative, that if petitioner did have a profit-sharing plan in 1974 rather than the mere intention to create such a plan, the plan did not meet the requirements of the regulation that a plan be a "definite written program and arrangement which is communicated to the employees. Petitioner takes the position that a written plan is not a statutory requirement and that the Secretary of the Treasury exceeded his interpretative authority by creating language which effectively amends the statute. Petitioner takes the further position that even if the regulation is valid, petitioner has complied with the regulations through the various notes taken by Mrs. Pugh and the attorney, the memorandum written by the attorney, the trust instrument, the written notice to the employees, and the written action of the board.

In support of its position that present intent to form a plan coupled with conduct taken in furtherance thereof is sufficient to form an adequate, qualified plan within the meaning of section 401(a), petitioner relies upon several cases where the courts have held that through their actions, taxpayers have exhibited an intent sufficient to give rise to implied trusts that satisfy the requirements of section 401(a). *Trenton Times Corp. v. United States*, 361 F. Supp. 222 (D. N.J. 1973); *Dejay Stores, Inc. v. Ryan*, 229 F.2d 867 (2d Cir. 1956). Moreover, petitioner emphasizes that absent a written trust and plan, the District Court in *Hill York Corp. v. United States*, an unreported case (S.D. Fla. 1964, 14 AFTR 2d 5160, 64–2 USTC par. 9654), found the taxpayer to have demonstrated adequate intent and conduct to form a qualified profit-sharing plan within the meaning of section 401(a). Petitioner submits that in the instant case, the present intent and supportive conduct consist of the following: (1) Agreement by board members to formulate a profit-sharing plan, (2) execution on December 30, 1974, of a profit-sharing trust instrument, (3) contribution of $16,123 to the trust, (4) informing ETS full-time employees of the board of directors' decision to adopt a profit-sharing plan, (5) the 1975 filing of informational forms with the Internal Revenue Service and the Department of Labor with respect to the profit-sharing plan, (6) recordation of employer trust contributions in petitioner's bookkeeping journal, (7) adoption of a formal profit-sharing plan instrument on April 15, 1975, with provisions not materially

different from those discussed in 1974, and (8) receipt of profit-sharing plan benefits by employees in years following 1974.

Petitioner's reliance on *Trenton Times Corp. v. United States, supra, Dejay Stores, Inc. v. Ryan, supra,* and *Hill York Corp. v. United States, supra,* is misplaced. Aside from different issues raised and factual divergencies between those cases and the instant one—

an implied or *de facto* trust may arise from the conduct of the parties even where they expressly intend *not* to create a trust and the court will treat the matter as if a trust had been intended. * * * if the parties do that to which the law attaches the consequences of a trust, they are considered to have expressed the necessary intent. * * * [*Trenton Times Corp. v. United States, supra* at 225–226.]

See also *Tavannes Watch Co. v. Commissioner,* 176 F.2d 211 (2d Cir. 1949), revg. 10 T.C. 544 (1948). Unlike trusts, if parties expressly intend not to create a profit-sharing plan, such a deferred benefit program will not arise. Moreover, as we will discuss below, pursuant to the technical standards of Federal tax law, the creation of a profit-sharing plan within the meaning of section 401(a) et seq. requires express, affirmative intent and conduct in the form of a written, permanent, specific program. Contra, *Hill York Corp. v. United States, supra.*[7]

----

[7]In *Hill York Corp. v. United States,* an unreported case (S.D. Fla. 1964, 14 AFTR 2d 5160, 5162, 64–2 USTC par. 9654, p. 93,623), the court addressed the issue of whether taxpayer-corporations were entitled to deduct contributions made to trustees on approximately June 28, 1957, for purposes of employee profit-sharing, where a plan document was not executed until Aug. 30, 1957, fully 2 months after the close of the taxpayers' fiscal years. The court reasoned that—

"The preliminary question of whether or not there was a valid and subsisting trust-plan existing on June 30, 1957 must be answered in the affirmative. There was. All of the essential elements of the trust and plan were in existence on June 30, 1957. There was a person competent to create the trust, an indication of intention, property to which the trust pertained, a definite and present disposition of such property, a definite trustee, definite beneficiaries, and sufficient declaration of the terms that a trustee could administer and a court of equity could enforce the trust and plan. * * *

\*　　\*　　\*　　\*　　\*　　\*　　\*

"However, the government argues that there was no plan in existence during the fiscal year cognizable under the federal law because the conditions of Treasury Regulations, Section 1.401–1, and specifically those of sub-section 1.401–1(a)(2), were not met. This section provides that there must be a definite written program which is communicated to the employees. Such an argument does not seem consonant with the Code language. Nor need this Court find any conflict between the statute and the regulations. Section 1.401–1, itself, does not spell out a specific time at which the requirement of writing and communication to employees must be met. Although the government's brief states:

'The condition under discussion, that there be a definite written program in existence as of the close of the tax year, arises under subparagraphs (a)(1) and (2), * * *'

Our conclusions that for purposes of section 401(a) et seq. a plan must be in writing and that the Secretary of the Treasury did not exceed his authority in prescribing section 1.401–1(a)(2), Income Tax Regs., are based upon a number of considerations. First, congressional intervention in the pension and profit-sharing plan area has sought to expand employees' rights and has consistently been mindful to safeguard participants against the detrimental operation of these deferred-benefit plans.[8]

---

"this Court has read and re-read those paragraphs as well as the section generally and fails to find that the regulations make any reference to a time period. Certainly, Section 1.401–5 of the Regulations merely traces the language of Code Section 401(b) and does not purport to change the statutory scheme. The government's brief adds words to the Regulations which do not exist."

In our view, the Court in the *Hill York Corp.* case overlooked the fact that an employer's entitlement to a deduction for contributions made to a profit-sharing plan is governed by sec. 404(a)(3). As applicable to the tax years involved in both *Hill York Corp.* and the instant case, sec. 404(a)(3) provides in part:

(a) GENERAL RULE.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year:

* * * * * * *

(3) STOCK BONUS AND PROFIT-SHARING TRUSTS.—

(A) LIMITS ON DEDUCTIBLE CONTRIBUTIONS.—In the taxable year when paid, if the contributions are paid into a stock bonus or profit-sharing trust, and if such taxable year ends within or with a taxable year of the trust with respect to which the trust is exempt under section 501(a) * * *

This section clearly requires that the trust must be exempt under sec. 501(a) in the taxable year in which the contribution is made for that payment to be deductible. See House Ways and Means Committee Report, H. Rept. 2333, 77th Cong., 2d Sess. 105–106 (1942); see also sec. 1.404(a)–9(a), Income Tax Regs.

Sec. 501(a) as applicable to the year in issue in the *Hill York Corp.* case and the instant case provides:

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle * * *

It therefore appears to us that the requirements of sec. 401(a) must be met for the year in which the deduction is claimed, which therefore requires compliance in that year with the provisions of sec. 1.401–1(a)(2), Income Tax Regs.

[8]For example, the Revenue Act of 1921 provided for exemption treatment of trusts forming a part of stock bonus or profit-sharing plans created for the exclusive benefit of "some or all of his employees." Revenue Act of 1921, Pub. L. 67–98, 42 Stat. 227, sec. 219(f). Failure to cover certain employees and discrimination in favor of officers or high salaried employees were not prohibited by the Revenue Act of 1921 or the Revenue Act of 1926. Yet, the Revenue Act of 1942, Pub. L. 77–753, 56 Stat. 798, sec. 162(a), and the Internal Revenue Code of 1954, sec. 401(a)(3)(A), extended the ample coverage requirements. Similarly, by adding alternative provisions, discriminatory classifications and contributions became unacceptable. Revenue Act

It has been the intent of Congress to curtail the opportunities available for creating deferred-benefit programs with such tenuous and vague provisions as to defy certain control over their enforceability. Congressional enactment of ERISA further advanced this legislative trend toward protecting plan participants and beneficiaries by statutorily mandating that pension, profit-sharing, and employee stock bonus plans must "be established and maintained pursuant to a written instrument." Employee Retirement Income Security Act of 1974, Pub. L. 93–406, 88 Stat. 829, sec. 402(a)(1). The conference report expressed that "A written plan is to be required in order that every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan. Also, a written plan is required so the employees may know who is responsible for operating the plan." Conf. Rept. 93–1280 (1974), 1974–3 C.B. 415, 458.[9]

Prior to the enactment of the Employee Retirement Income Security Act of 1974, Pub. L. 93–406, 88 Stat. 829, Congress had not specifically addressed the question of whether pension, profit-sharing, and stock bonus plans must be evidenced by a written instrument. However, as we pointed out in *Jones v. Commissioner*, 51 T.C. 651, 654 (1969), the administrative interpretation of the word "plan" as a "definite written program and arrangement which is communicated to the employees"

---

of 1942, sec. 162(a)(3) and (4); Internal Revenue Code of 1954, sec. 401(a)(3)(B) and sec. 401(a)(4). See also, for example, changes in vesting requirements. Prior to amendment by ERISA, sec. 401(a)(7) demanded that full vesting be provided only upon a corporate plan's termination or total contribution cessation. In no other circumstances did the Code mandate vesting by the time a participant reached normal retirement age. ERISA mandated substantial changes with regard to the nonforfeitability of employee benefits. Employee Retirement Income Security Act of 1974, Pub. L. 93–406, 88 Stat. 829, sec. 203.

[9]On Sept. 10, 1974, shortly after the enactment of ERISA, the Internal Revenue Service issued T.I.R. 1308 published as Rev. Proc. 74–38, 1974–2 C.B. 492, which covered the procedure for plans for the year 1974 adopted after Sept. 2, 1974. Rev. Proc. 74–38 provides in part, 1974–2 C.B. at 493:

Sec. 3. DEFINITIONS.

\* \* \* \* \* \* \*

.04 "New plan subject to prior law" means a plan adopted and put into effect by an employer after January 1, 1974, whose first plan year begins on or before September 2, 1974, whether or not it is adopted and put into effect by an employer before September 2, 1974.

\* \* \* \* \* \* \*

Sec. 4. PROCEDURES.

.01 District Directors are authorized to issue determination letters under prior law with respect to pre-existing plans and new plans which are subject to prior law. Such determination letters shall have limited application \* \* \*

dates back to 1943. Sec. 1.401–1(a)(2), Income Tax Regs.; sec. 39.165–1, Regs. 118; sec. 29.165–1, Regs. 111; sec. 19.165–1, Regs. 103; T.D. 5278, 1943 C.B. 478, 481. The lengthy duration of the regulation, the courts' reliance placed thereon, the Commissioner's consistency in its interpretation, and congressional opportunity for scrutinizing the regulation when reconsidering the statute, are indicative of the viability and vitality of a regulation. *National Muffler Dealers Association, Inc. v. United States,* 440 U.S. 472 (1979); *Commissioner v. South Texas Lumber Co.* 333 U.S. 496, 501 (1948). As stated in *Helvering v. Winmill,* 305 U.S. 79, 83 (1938), "Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." The Supreme Court in *National Muffler Dealers Association, Inc. v. United States, supra,* citing *United States v. Correll,* 389 U.S. 299, 307 (1967), and *United States v. Moore,* 95 U.S. 760, 763 (1877), stated that the delegation to the Commissioner of the authority to issue regulations helps insure in "this area of limitless factual variation" like treatment of varying cases and guarantees that the interpretative rules will be written by persons with a particularized knowledge of the subject area. In *Jones v. Commissioner, supra,* we pointed out that the term "plan," as found in section 401(a) et seq., and its predecessor section 165 of the Internal Revenue Code of 1939, has eluded alteration.[10] Accordingly, we continue to be satisfied that, in reenactment of that statute, Congress had adopted the administrative interpretation of the term "plan."

Petitioner argues that if the language of section 1.401–1(a)(2), Income Tax Regs., requiring a written arrangement or program is consistent with the meaning of "plan" in section 401(a), neither the statute nor the regulations requires that the plan be evidenced by a single written document. Petitioner argues that a collection of writings can constitute a qualified plan. Specifically, petitioner contends that in lieu of a single writing, all conference notes and memorandum, written action of the board, trust instrument, and notice to employees compose a qualified profit-sharing plan.

---

[10]See also *Vernaccini v. Commissioner,* T.C. Memo. 1974–66.

While the cases cited by both petitioner and respondent raise issues other than those in the instant case, an inspection of those cases reveals that where a qualified trust instrument exists, the courts would accept a broad spectrum of plan formats as qualifying for purposes of section 401(a).[11] Single written plan instruments have been regarded as satisfactory evidence of a pension or profit-sharing plan. *Dejay Stores, Inc. v. Ryan*, 229 F.2d 867 (2d Cir. 1956); *Catawba Industrial Rubber Co., Inc. v. Commissioner*, 64 T.C. 1011 (1975) (although nonexistence of the trust instrument in the tax year precluded the plan's qualification).[12] In several older cases, decided pursuant to the less stringent trust rules of sections 165(a) and 23(p), I.R.C. 1939, we found tolerable those plans consisting of a "tentative" trust agreement and such supporting documents as board minutes. *Crow-Burlingame Co. v. Commissioner*, 15 T.C. 738 (1950); *555, Inc. v. Commissioner*, 15 T.C. 671 (1950). However, where documents contain uncertain terms, are merely preparatory in nature, and are tentative when viewed in their entirety, the courts have concluded that the instruments fail to present features essential to a "plan" as intended by section 401(a).[13] E.g., *Comprehensive Designers International, Ltd. v. Commissioner*, 66 T.C. 348 (1976) (where the taxpayer argued that a descriptive plan booklet and interim trust deed to which the booklet was annexed should be considered a proper plan although (1) lacking nonforfeitability and determinable benefit rules, and (2) the provisions of the interim trust provided that if a conflict arose between language contained in the booklet and terms of a forthcoming final trust deed, the latter would prevail).

---

[11]Some of the cited cases raise the question of the application of secs. 165(a) and 23(p), I.R.C. 1939, to a determination of the proper effective date of trust instruments adopted by accrual basis taxpayers several weeks after the close of the taxpayers' tax year. E.g., *Barrett Timber & Dunnage Corp. v. Commissioner*, 29 T.C. 76 (1957); *Dejay Stores, Inc. v. Ryan*, 229 F.2d 867 (2d Cir. 1956). Other cases address the question of whether under secs. 165(a) and 23(p), I.R.C. 1939 (the predecessors of sec. 404(a)(6)), accrual basis taxpayers who intended to establish qualified pension plans in one tax year but who failed to contribute to their pension trusts until the following tax year created with retroactive effect pension trusts in the first tax year. *555, Inc. v. Commissioner*, 15 T.C. 671 (1950); *Crow-Burlingame Co. v. Commissioner*, 15 T.C. 738 (1950); *Abingdon Potteries, Inc. v. Commissioner*, 19 T.C. 23 (1952).

[12]See also *I.S.C. Inc. v. Commissioner*, T.C. Memo. 1978–288, affd. without published opinion 609 F.2d 501 (3d Cir. 1979).

[13]See also *Arlington Realty Co., Inc. v. Commissioner*, T.C. Memo. 1962–125.

After consideration of the above cases and the congressional intent in regulating the pension and profit-sharing area, we conclude that the "definite written program and arrangement" terminology of section 1.401–1(a)(2), Income Tax Regs., should be broadly construed to encompass various formats, including a collection of writings which creates a specific permanent plan. However, such a composite of documents would qualify as a section 401(a) deferred benefit plan only when it embodies all plan elements expressly required by section 401(a) which are both essential (1) to inform participating employees and their beneficiaries of their specific benefits, rights, and obligations, and (2) to insure the plan's enforceability.

An examination of the writings submitted by petitioner reveals a lack of definite and permanent ingredients vital for profit-sharing plan qualification. Sec. 1.401–1(b), Income Tax Regs.; *South Texas Commercial National Bank of Houston v. Commissioner*, 7 T.C. 764 (1946), affd. 162 F.2d 462 (5th Cir. 1947). The "Engineered Timber Sales, Inc. Profit-Sharing Trust" executed on December 30, 1974, provides for establishment of a trust fund, trust administration, investment of funds, optional employee insurance policies, expenses of administration, trust amendment and termination, and such miscellaneous clauses as a restraint on alienability of a participant's interest. Schedule A, appended thereto, names Mr. and Mrs. Pugh as trustees and states "$16,123.00 cash." The trust instrument does not specify eligibility, participation, and vesting standards, percentage contribution formula, and benefit-triggering event rules. The only additional definite provision supplied by the notice to ETS employees is the service requirement for plan eligibility. The written action of the board executed on December 30, 1974, provides no other substantive plan ingredients. While the written action of the board indicates that the December 30, 1974, trust agreement is adopted and executed by the board and that $16,123 shall be the 1974 contribution, it otherwise merely indicates a future intent to adopt and execute a written plan instrument. All handwritten notes of the December 10 and December 20, 1974, conferences amongst Mr. Pugh, Mrs. Pugh, and the attorney and the December 10 memorandum reveal no additional specific plan provisions. The notes and memorandum indicate only the board members' consideration of, or tentative and abstract agreement to, eligibility, vesting and participation

requirements; a percentage contribution formula; and benefit-triggering events. The absence of precise and absolute rules would make impossible the enforceability of the plan by ETS employees in any court. In our opinion, the above-stated legislative intent in regulating deferred-benefit plans dictates that these deficits are flaws fatal to the successful formation of a section 401(a) "plan."

Citing section 1.401–1(a)(2), Income Tax Regs., and his Rev. Rul. 71–90, 1971–1 C.B. 115, and Rev. Rul. 72–509, 1972–2 C.B. 221, respondent argues that petitioner failed to properly communicate the reputed section 401(a) profit-sharing plan to its employees. On the other hand, petitioner submits that an oral communication given after the effective adoption of a plan is sufficient for purposes of section 401(a). In support of its position, petitioner cites *Aero Rental v. Commissioner,* 64 T.C. 331 (1975); *Precision Industries, Inc. v. Commissioner,* 64 T.C. 901 (1975); and *Lozano, Inc. v. Commissioner,* 68 T.C. 366 (1977). Before the passage of ERISA (which, effective as of January 1, 1975, requires the distribution of a summary plan description booklet to employees),[14] oral communication might have been sufficient in certain circumstances. For instance, in *Aero Rental v. Commissioner, supra* at 337, where a precise, written stock bonus plan existed, we stated:

When there are only a few employees, as in this case, it may be practicable and adequate to have informal meetings to discuss the plan, to read the plan to the employees and discuss their questions with them, and to announce merely that the plan can be examined by anyone at any time without laying down specific conditions for the examination. A copy of the plan or a written description of it might have been helpful to an employee, but we cannot say that either was essential to the employees acquiring an understanding of the plan; nor are we inclined to hold that the plan fails to qualify merely because the employees were not provided with written information.

The instant case is unlike that of *Aero Rental v. Commissioner, supra.* There, the original written employee stock bonus plan contained all necessary ingredients on which a section 401(a) plan could be based. Because several of those provisions not called into operation were deemed objectionable, they were amended with retroactive application. In contrast, here petition-

---

[14]Employee Retirement Income Security Act of 1974, Pub. L. 93–406, 88 Stat. 829, sec. 102 and sec. 111(b)(1), 1974–3 C.B. 1, 10, 21.

er's arrangement lacked numerous essential and precise provisions in 1974, and as stated above, the writings could not be treated as a "plan" within the meaning of section 401(a). Petitioner's witnesses testified that prior to Christmas 1974, Mr. and Mrs. Pugh orally disclosed the fundamental features of the purported plan to the full-time employees, and a notice to employees was posted in December 1974 or January 1975. In our view, even accounting for the passage of time, the employees other than Mr. and Mrs. Pugh demonstrated that in 1974 they had a limited, if any, understanding of those "plan" ingredients presumably discussed, including eligibility, participation and vesting rules, a percentage contribution formula, and an enumeration of the benefit-triggering events. In light of these circumstances, the disclosures cannot be considered adequate communication.

Petitioner's reliance on *Precision Industries, Inc. v. Commissioner, supra,* and *Lozano, Inc. v. Commissioner, supra,* is misplaced. In those cases, we addressed the issue of whether a taxpayer could accrue a liability in a tax year for contributing to a plan where the precise amount of the contribution was not communicated to the taxpayer's employees at that time. The issue raised in the present case is separate and distinct from that raised in the two cited cases. See *Aero Rental v. Commissioner, supra* at 338. Accordingly, those cases have no bearing upon our decision here.

Petitioner argues that if the documentation of its profit-sharing program is fatally defective on December 31, 1974, section 401(b), as amended by the Employee Retirement Income Security Act of 1974, Pub. L. 93–406, 88 Stat. 829, sec. 1023 and sec. 1024, 1974–3 C.B. 1, 112,[15] allows retroactive adoption of a

---

[15]Sec. 1023 of ERISA amends sec. 401(b), I.R.C. 1954, to provide as follows:

SEC. 1023. RETROACTIVE CHANGES IN PLAN.

Section 401(b) (relating to certain retroactive changes in plan) is amended to read as follows:

"(b) CERTAIN RETROACTIVE CHANGES IN PLAN.—A stock bonus, pension, profit-sharing, or annuity plan shall be considered as satisfying the requirements of subsection (a) for the period beginning with the date on which it was put into effect, or for the period beginning with the earlier of the date on which there was adopted or put into effect any amendment which caused the plan to fail to satisfy such requirements, and ending with the time prescribed by law for filing the return of the employer for his taxable year in which such plan or amendment was adopted (including extensions thereof) or such later time as the Secretary or his delegate may designate, if all provisions of the plan which are necessary to satisfy such requirements are in effect by the end of such period and have been made effective for all purposes for the whole of such period."

qualified plan. Petitioner submits that where an original profit-sharing plan fails to satisfy the requirements of section 401(a), although it · is implemented and operated as if qualifying thereunder, the subsequent adoption and execution of a single qualifying plan instrument by the board of directors (here on April 15, 1975), should apply nunc pro tunc to the date the board of directors originally had deemed its employee profit-sharing plan to be effective (here on January 1, 1974).

In arguing that the section 401(b) retroactive remedial period applies to the instant case, petitioner refers to those cases where retroactive correction of employee plans has not been permitted and contrasts the instant facts against the circumstances of those cases. As indicated by petitioner, although proper in form, the plans in *Forsyth Emergency Services, P.A. v. Commissioner*, 68 T.C. 881 (1977), and *Myron v. United States*, 550 F.2d 1145 (9th Cir. 1977),[16] operated discriminatorily in favor of certain prohibited groups, and therefore, the courts refused to allow retroactive amendment. Likewise, in *Jack R. Mendenhall Corp. v. Commissioner*, 68 T.C. 676 (1977), based upon the tests enunciated in *Aero Rental v. Commissioner*, 64 T.C. 331 (1975), rather than upon section 401(b), we held that remedial amendments to the taxpayer's profit-sharing agreement were not effective retroactively. Holding in *Aero Rental v. Commissioner, supra*, that section 401(b) is not exclusive but instead merely a "safe harbor," we considered two conditions that must be present before a taxpayer might qualify thereunder for retroactive treatment: (1) The original plan's objectionable provisions were never called into operation, and (2) the exercise of reasonable diligence by the taxpayer in seeking a determination letter from the Internal Revenue Service with regard to the exemption status of the plan. *Aero Rental v. Commissioner, supra;* e.g., *Jack R. Mendenhall Corp. v. Commissioner, supra* at 681; *Oakton Distributors, Inc. v. Commissioner*, 73 T.C. 182 (1979).

An examination of the legislative history, cases, and statutory language leads us to the conclusion that under the circumstances

---

SEC. 1024. EFFECTIVE DATES.

Section 1023 shall take effect on the date of the enactment of this Act. [Sept. 2, 1974]

[16]Petitioner also refers to the plan in *St. Joseph Bank & Trust Co. v. Commissioner*, T.C. Memo. 1975-182.

of the instant case, petitioner's adoption on April 15, 1975, of a single plan instrument is not effective nunc pro tunc to the 1974 taxable year. The rules of *Aero Rental v. Commissioner, supra,* presuppose the existence of a written plan either containing intolerable provisions or lacking at least one salient element. However, as below discussed, since in 1974 petitioner lacked a written plan, qualified or nonqualified, *Aero Rental v. Commissioner, supra,* is without application.

Effective as of September 2, 1974, the section 401(b)-prescribed "remedial amendment period" terminates on the last date for filing the employer's tax return, including extensions thereof, for the taxable year in which a nonqualifying plan or disqualifying amendment was adopted, or such later date as the Secretary of the Treasury determines within his discretion. As with *Aero Rental v. Commissioner, supra,* to trigger the application of section 401(b), a nonqualifying plan must exist.

In addition to providing for the tax treatment of a qualified profit-sharing plan, sections 401 through 415 of the Code refer to a "plan" not qualifying for the beneficial treatment attaching to a section 401(a) plan. E.g., secs. 401(b) and 402(b). For purposes of sections 401 through 415, a deferred compensation scheme is recognized as a "plan," qualified or nonqualified, only if it satisfies a basic condition. The crystallization of that basic standard is culled from the repeated congressional intent that through its provisions a deferred compensation plan protects the best interests of participants and beneficiaries, inhibits improper operation of the plan, and assures certain control over its enforceability. Employee Retirement Income Security Act of 1974, Pub. L. 93–406, 88 Stat. 829, sec. 2(a); H. Rept. 533, 93d Cong., 1st Sess. (1973), 1974–3 C.B. 210, 220.

Where retirement pay is granted for services rendered which at the time rendered give rise to a legal obligation, the retirement pay is a contractual right rather than a gratuity. 70 C.J.S., Pensions, sec. 1, p. 424 (1951). As a contractual arrangement, the retirement pay may be in the form of a profit-sharing plan which safeguards the rights and benefits of participants and beneficiaries. Yet, a bona fide contract requires the presence of all essential and precise terms. In the instant case, a number of the definite elements necessary for the formation of a profit-sharing plan were absent in 1974, namely definite eligibility, participation and vesting requirements, a percentage contribu-

tion formula, and an enumeration of benefit-triggering events. Absent these features, an employer is unable to precisely apprise employees of the content of all plan provisions, and employees or other parties are precluded from examining and effectively policing the purported plan. The failure to embrace the necessary features causes petitioner's submitted writings to fall outside the ambit of the term "plan" as used within sections 401 through 415 of the Code.

While Congress intended that a newly inaugurated plan, facially defective in its terms and form, be retroactively curable by amendment, we are of the opinion that to stretch section 401(b) to permit nunc pro tunc adoption of an original "plan" would be in flagrant abuse of the intent of Congress. The language of section 401(b) requires that corrections be applied retroactively to the year in which a plan "was put into effect." That phraseology indicates that Congress contemplated the prior existence of an unqualified plan as a prerequisite to the triggering of section 401(b). In the instant case, the writings, which petitioner would have us consider a "plan," were merely preparations preceding the adoption of such a plan. These documents did not constitute either a qualified or a nonqualified profit-sharing plan in 1974. Consequently, the April 15, 1975, adoption and execution of the "Engineered Timber Sales, Inc. Profit Sharing Plan" is not effective retroactively to taxable year 1974.[17]

Petitioner alternatively argues that pursuant to section 404(a)(5) it is entitled to a deduction for its contribution to a profit-sharing trust, although not qualified under section 401(a). Section 404(a)(5) permits an employer that makes contributions to a deferred-compensation plan on behalf of its employees to deduct those ordinary, necessary, and reasonable contributions if the participating employees are required to include the amounts

---

[17]Respondent made no argument that in any event the adoption of a plan on Apr. 15, 1975, was untimely. However, sec. 401(b), I.R.C. 1954 (n. 15 *supra*), limits retroactive changes in profit-sharing plans to the "time prescribed by law for filing the return of the employer for his taxable year in which such plan or amendment was adopted (including extensions thereof)." Petitioner is a corporation. Its return for 1974 was due on Mar. 15, 1975 (sec. 6072(b), I.R.C. 1954). The return was filed on Mar. 10, 1975, and there is no indication in the record that any extension of time for filing the return was requested or granted.

attributable to the contributions in their gross income for the particular tax year.[18] But as above concluded, petitioner did not have a qualified or nonqualified plan in 1974, and therefore, section 404(a)(5) is without application.

Yet, where a plan does not exist within the meaning of sections 401 through 415, but a method of employer contributions has the effect of a profit-sharing plan, section 404(a) applies through section 404(b).[19] The question then becomes whether petitioner's method of "contributions or compensation has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or other plan deferring the receipt of compensation." Section 1.404(b)–1, Income Tax Regs., in part interprets section 404(b) to include circumstances—

where a corporation pays pensions to a retired employee or employees or to their beneficiaries in such amounts as may be determined from time to time by the board of directors or responsible officers of the company, or where a corporation is under an obligation, whether funded or unfunded, to pay a pension or other deferred compensation to an employee or his beneficiaries, there is a method having the effect of a plan deferring the receipt of compensation for which deductions are governed by section 404(a). * * *

The predecessor provision of section 404(b), section 23(p)(1)(D), I.R.C. 1939, was enacted by the Revenue Act of 1942. Section 19.23(p)(1)(D)–1, Regs. 103, adopted by the Secretary of the Treasury to clarify section 23(p)(1)(D), I.R.C. 1939, in pertinent part stated that contributions to plans not meeting the requirements of section 165(a), I.R.C. 1939 (the predecessor of sec. 401(a)), "are deductible * * * to the extent that individual employees' rights to or derived from such employer's contribution or such compensation are nonforfeitable at the time the contribution or compensation is paid." T.D. 5278 (July 8, 1943), 1943–C.B. 478, 498. Section 19.165(c)–1, Regs. 103, defines the term "nonforfeitability" as the lack of a "contingency under the

---

[18]Sec. 404(a)(5) provides:

(5) OTHER PLANS.—If the plan is not one included in paragraph (1), (2), or (3), in the taxable year in which an amount attributable to the contribution is includible in the gross income of employees participating in the plan, but, in the case of a plan in which more than one employee participates only if separate accounts are maintained for each employee.

[19]Sec. 404(b) provides:

(b) METHOD OF CONTRIBUTIONS, ETC., HAVING THE EFFECT OF A PLAN.—If there is no plan but a method of employer contributions or compensation has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or similar plan deferring the receipt of compensation, subsection (a) shall apply as if there were such a plan.

plan which may cause the employee to lose his rights in the contribution." T.D. 5278 (July 8, 1943), 1943–C.B. 478, 487. This regulatory history indicates that the application of section 404(b) to the instant case is predicated upon the nonforfeitability of the ETS employees' rights in the $16,123 when deposited into trust. As we have specified, petitioner's arrangements were vague and did not provide the employees with nonforfeitable rights to particular portions of the moneys. In reliance on the above, it follows that section 404(b) is inapplicable to petitioner, and accordingly, petitioner cannot deduct the $16,123 "contribution" pursuant to section 404.

Even if section 404(b) were applicable to the circumstances of this case, section 402(b) would preclude the claimed deduction. The timing for deductibility of an employer contribution to a near facsimile of a plan is governed by the timing of declaration of income by the beneficiaries. Section 402(b) controls the tax treatment of beneficiaries of a trust not exempt under section 501(a).[20] Section 402(b) requires an employee to include in his income contributions attributable to a nonexempt trust in accordance with section 83.[21] In pertinent part, section 83

---

[20]In pertinent part sec. 402(b) states:

(b) TAXABILITY OF BENEFICIARY OF NONEXEMPT TRUST.—Contributions to an employees' trust made by an employer during a taxable year of the employer which ends within or with a taxable year of the trust for which the trust is not exempt from tax under section 501(a) shall be included in the gross income of the employee in accordance with section 83 (relating to property transferred in connection with performance of services), except that the value of the employee's interest in the trust shall be substituted for the fair market value of the property for purposes of applying such section. * * *

[21]Sec. 83(a) and (c)(1) states:

SEC. 83. PROPERTY TRANSFERRED IN CONNECTION WITH PERFORMANCE OF SERVICES.

(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

provides that property transferred to a person in connection with the individual's performance of services is included in his gross income in the first year that the person's rights in the property are not subject to a substantial risk of forfeiture or become transferable.

Since petitioner adopted a nonexempt trust on December 30, 1974, the resolution of this question would depend upon the application of section 83 to the facts and circumstances in the instant case. Section 83 requires an individual to include in his gross income property *transferred* to him in connection with his performance of services. It is significant that the language of section 83(a) requires the previous transfer of property. Section 1.83–3(a), Income Tax Regs., defines "transfer" as occurring "when a person acquires a beneficial ownership interest in such property." The Supreme Court has stated that:

> The expression, beneficial use or beneficial ownership or interest, in property is quite frequent in the law, and means in this connection such a right to its enjoyment as exists where the legal title is in one person and the right to such beneficial use or interest is in another, and where such right is recognized by law, and can be enforced by the courts, at the suit of such owner or of some one in his behalf. * * * [*Montana Catholic Missions v. Missoula County*, 200 U.S. 118, 127–128 (1906).]

Since that time, the States have used this concept of control to represent beneficial ownership. See, e.g., *Tatum Bros. Real Estate & Investment Co. v. Watson*, 109 So. 623 (Fla. 1926).

In 1974, none of the ETS employees had acquired a beneficial ownership interest in any portion of the $16,123 that petitioner placed in the trust's account at the Landmark Bank of Tampa. Aside from any capacity that Mr. and Mrs. Pugh might have had from their fiduciary status as trustees and in their capacities as board members, none of petitioner's employees qua employees had dominion or control over the $16,123 in the Landmark Bank of Tampa account. The language of the ETS trust instrument never provided any employee with a specific vested or nonvested portion of the moneys.[22] In our view, these factors cause the

---

(c) SPECIAL RULES.—For purposes of this section—

(1) SUBSTANTIAL RISK OF FORFEITURE.—The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual.

[22]Respondent points out that art. VIII(d) of the Dec. 30, 1974, trust agreement provided for the reversion of all moneys contributed by petitioner to the corporation in the event that

benficial ownership of the $16,123 not to be "transferred" to the employees in 1974 within the meaning of section 83.

We therefore hold that (1) petitioner did not have a qualified profit-sharing plan within the meaning of section 401(a) in 1974, and (2) petitioner's employees did not acquire a beneficial ownership interest in the ETS trust contributions in 1974.

Because of a concession by respondent with respect to the year 1973,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

---

petitioner would be unable to secure from the Internal Revenue Service on or before Dec. 31, 1975, approval of the trust as a qualified tax-free trust under the Code. Where an otherwise valid sec. 401(a) plan exists, this contingency would not cause an irrevocable contribution to the plan's trust to become revocable by the employer; rather, in that case, such a contingency places the contribution outside the control of an employer. *Surface Combustion Corp. v. Commissioner,* 181 F.2d 444, 448 (6th Cir. 1950), affg. 9 T.C. 631, 655 (1947); *555, Inc. v. Commissioner,* 15 T.C. 671 (1950). However, the instant case is distinguishable. Because of petitioner's failure to inaugurate a valid plan in 1974, the situation here is not analogous to a contingency invocable only through powers outside the scope of an employer. The $16,123 held in 1974 in a Landmark Bank of Tampa account was in the nature of a corporate deposit similar to an escrow account, and when petitioner received an adverse determination, the opportunity, albeit unexercised, may have become available to petitioner to act upon the trust instrument's contingency language. However, we need not decide petitioner's right under art. VIII to convert the $16,123 to any purpose it deemed appropriate, since, despite the provision, the facts here failed to show any vesting of any funds to employees in 1974.