MARCUS WIGUTOW, ESTATE OF ROSE WIGUTOW, DECEASED, MARCUS WIGUTOW, ADMINISTRATOR, ELIZABETH WIGUTOW AND MARCUS WIGUTOW, M.D., INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wigutow v. Commissioner
Docket No. 2965-80.
United States Tax Court
T.C. Memo 1983-620; 1983 Tax Ct. Memo LEXIS 168; 46 T.C.M. (CCH) 1616; T.C.M. (RIA) 83620; September 29, 1983. John F. Beggan and Stephen M. Gatlin, for the petitioners. John J. Morrison, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In separate deficiency notices, respondent has determined the following deficiencies in these joint petitioners' Federal income taxes: Taxable Year
Petitioners
Ending
Deficiency
Marcus Wigutow and Estate of
Rose Wigutow, Deceased (Marcus
Wigutow, Administrator)
12-31-72
$14,449.67
Marcus Wigutow and Elizabeth
Wigutow
12-31-73
3,204.19
12-31-74
6,111.36
12-31-75
3,362.89
12-31-76
2,537.10
Marcus Wigutow, M.D., Inc.
4-30-73
8,339.02
4-30-74
2,183.62
4-30-75
1,707.39
4-30-76
1,873.41
After concessions, the following issues are presented for our decision: I. Medical Expense Plan
(a) Whether medical reimbursement payments made by Marcus Wigutow, M.D., Inc., to Marcus Wigutow, its president *174 and sole shareholder, were made pursuant to a plan qualifying the payments for exclusion from income under section 105; [1] and (b) Whether Marcus Wigutow, M.D., Inc., may deduct the medical expense reimbursement payments under section 162(a). II. Pension Trust
(a) Whether Marcus Wigutow, M.D., Inc., may deduct its contributions to a nonqualified pension trust under section 404(a)(5); and (b) Whether the corporation's pension plan contributions qualify as earned income to Marcus Wigutow under section 1348. FINDINGS OF FACT This case was submitted fully stipulated; the stipulated facts are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Prior to her death on November 14, 1972, Rose Wigutow ("Rose") was married to petitioner Marcus Wigutow ("Marcus"). Marcus filed a joint 1972 Federal income tax return on behalf of himself and Rose with the Internal Revenue *175 Service Center at Kansas City, Missouri. On September 24, 1973, Marcus married petitioner Elizabeth Wigutow ("Elizabeth"). Marcus and Elizabeth filed joint Federal income tax returns for 1973, 1974, 1975, and 1976 with the Internal Revenue Service Center at Kansas City, Missouri. Marcus and Elizabeth resided in Chicago, Illinois, when the petition herein was filed. Marcus Wigutow, M.D., Inc. ("the corporation") was at all relevant times duly organized and existing under the Medical Professional Corporation Act of the State of Indiana. It was incorporated on May 25, 1971. The corporation filed Federal corporate income tax returns for its taxable years ending April 30, 1973, April 30, 1974, April 30, 1975, and April 30, 1976 with the Internal Revenue Service Center at Memphis, Tennessee. The corporation's principal place of business was in Merrillville, Indiana, when the petition herein was filed. Since its incorporation, Marcus has owned 100 percent of the issued and outstanding shares of the stock of the corporation and was president, treasurer, and one of the directors of the corporation. The corporation paid no dividends during any of the years in issue. Marcus is *176 a medical doctor licensed to practice medicine in the State of Indiana. At all relevant times, Marcus was engaged in the practice of medicine, as a psychiatrist, in the State of Indiana solely as an employee of the corporation. On June 9, 1971, Marcus and the corporation entered into an employment agreement providing in pertinent part: 1. Effective as of June 9, 1971, up to and including April 12, 1972, the Corporation agrees to employ [Marcus] to serve in Gary, Indiana and environs as designated by the Corporation. 2. This Agreement shall be renewable annually upon agreement of the parties. * * * 4. It is hereby understood and agreed that [Marcus] will devote his entire professional efforts to the conduct of the Corporation's practice and that [Marcus] will not compete in any manner with the Corporation, nor will he aid any competitor of the Corporation in any manner. * * * 6. The Corporation agrees to compensate [Marcus] for his services with a salary of $50,000 per year, payable in monthly installments before applicable withholding and social security taxes. [Marcus] shall also receive a bonus depending upon the profitability of the division of the *177 Corporation conducted by [him]. * * *. * * * With the exception of approximately nine and one-half months in 1975, during all relevant times Marcus was the sole medical doctor employed by the corporation, and the corporation was thereby engaged, solely through Marcus, in the trade or business of the practice of medicine in the State of Indiana. From February 28, 1975 through December 15, 1975, the corporation also employed Borivoj Divcic, M.D. ("Dr. Divcic") as a medical doctor engaged in the practice of psychiatry. During this nine and one-half month period, the corporation was also engaged through Dr. Divcic in the trade or business of the practice of emdicine in the State of Indiana. Rose was not employed by the corporation during the year 1972, nor was Elizabeth employed by the corporaion during the years 1973-1976. The corporation had full-time clerical and secretarial employees who were responsible for general typing, bookkeeping, billing, maintenance of files and appointment books, and acting as receptionists. These employees were Joyce Larsen from October 1973 through October 1976, Kathleen McClanahan from August 1971 through September 1973, and Susan Fowble *178 from July 1972 through March 1973. From May 1971 through April 1974, the corporation employed Judith Lammons as a full-time psychiatric social worker. Her duties included the initial screening of patients, both new and return. In this screening, Ms. Lammons recorded one or two pages of the patient's history, including the patient's complaint, family conflicts, and stresses and strains. Marcus utilized these patient histories in counseling sessions with such patients. From May 1971 through August 1975, the corporation employed Sharon Griegor as a part-time cotherapist for group therapy. Her duties included assisting Marcus in group therapy sessions conducted by Marcus. Her job was to reassure the patients and assist them in formulating their problems. During all relevant periods, the corporation employed no other individuals who performed services, other than solely clerical or secretarial services, for or on behalf of the corporation. At a meeting of the board of directors and the shareholder on April 10, 1973, the corporation passed a resolution awarding Marcus a bonus of $10,300, "thus making the total compensation paid to him for the year ending April 30, 1973, the *179 sum of $60,000.00…." These minutes also authorized contributions to the corporation's Pension Trust and Profit Sharing Trust. Medical Expense Plan
On June 10, 1971, the corporation declared the "MARCUS WIGUTOW, M.D., INC., MEDICAL EXPENSE BENEFIT PLAN" (the "Medical Plan") in a written instrument, which provided in pertinent part: WHEREAS, it is the intention of the Corporation to provide medical expense coverage for all the employees of this corporation as hereinafter set out. However, in the uncontrolled discretion of the Board of Directors, this plan shall include other employees, at any subsequent date. * * * 1. This plan shall be completely revocable by action of the Board of Directors of this Corporation at any time and shall continue until so revoked. There shall be no liability for medical expenses submitted following termination of this plan by the Board of Directors. 2. As of the annual period to begin June 10, 1971, and thereafter, the Corporation will reimburse all the employees and their dependents, exemptions and members of family, for any medical expense, dental expense, or other expenses as defined by the Internal Revenue Code of 1954, *180 Section 213, as amended, provided such expenditures are not otherwise compensated for by accident and health insurance maintained. Expenses shall also include drugs and medical supplies prescribed by a physician or other professional medical technician. 3. This plan shall continue pursuant to the Internal Revenue Code, Section 105 (b) and regulations issued thereunder, and shall be changed in accordance with said section as it may be subsequently amended from time to time. 4. The Corporation shall reimburse the Employees set forth hereinabove for any expenses as defined herein but only when adequate substantiation in the form of bills, invoices or cash receipts, cancelled checks or other documentary evidence are presented and only if reimbursement is requested after a reasonable time after said expenses have been incurred. A decision whether or not any expense is reimbursable medical expense and the timeliness of its submission to the Corporation, shall be in the Corporation's sole discretion and shall be final and conclusive and binding upon all of the parties hereto. * * * Marcus signed the declaration of the Medical Expense Plan both for the *181 corporation, in his capacity as president, and for himself, in his capacity as employee.Marcus was the only participant initially, and, at all relevant times, Marcus was the only employee of the corporation to participate in the Medical Expense Plan. In October 1968, Rose was diagnosed as having cancer and underwent an operation for the removal of a breast. From then until her death on November 14, 1972, her health steadily declined. Between October 1968 and March 1972, Rose underwent a hysterectomy and two or three other operations. She also had bone scans and cobalt treatments. From approximately April 1972 (at or around which time her spine was broken) until her death, Rose was confined to bed at home and received around-the-clock nursing care. Part of Rose's medical expenses described above was paid by medical insurance coverage, but the benefits of such coverage eventually ceased. On or about January 30, 1973, Marcus was shot several times in his abdomen by an intruder in his home. As a result, Marcus underwent surgery and was hospitalized during most of February 1973. He again underwent surgery and was hospitalized for approximately two weeks in April 1973. Marcus *182 was unable to return to work until May 1973. From sometime prior to 1972 through the periods in question and continuing to the present time, Marcus received psychotherapeutic treatment approximately four times per week. Part of this treatment was due to Marcus' need to refresh and improve his skills as a psychiatrist and part of this treatment was due to the effects that Rose's illness and death and the shooting incident had on Marcus. A major part of the corporation's Medical Expense Plan reimbursements for its fiscal year ending April 30, 1973, related to: (a) Rose's medical expenses as described above, which also constituted a major part of the corporation's Medical Expense Plan reimbursements during calendar year 1972; (b) Marcus' medical expenses as described above, which also constituted a major part of the corporation's Medical Expense Plan reimbursements during calendar year 1972; and (c) Marcus' psychotherapeutic treatment. Marcus' treatment also constituted a major part of the corporation's Medical Expense Plan reimbursements for its fiscal years ending April 30, 1974, April 30, 1975, and April 30, 1976, and during calendar years 1973, 1974, 1975, and 1976. During *183 the following calendar years, pursuant to the Medical Expense Plan, the corporation paid the following amounts in respect of medicine, drugs, medical, and dental expenses for the medical care of Marcus, his wife, and his dependents: Year
Amount
1972
$16,178.01
1973
6,589.81
1974
10,103.35
1975
5,587.33
1976
4,312.67
None of the individual petitioners (Marcus and Rose or Marcus and Elizabeth) reported as income or deducted as medical expenses these amounts on their joint Federal income tax returns for the years in issue. During the following fiscal years, pursuant to the Medical Expense Plan, the corporation paid the following amounts for medicine, drugs, medical, and dental expenses for the medical care of Marcus, his wife, and his dependents, and it deducted these amounts on its respective corporate income tax returns for those periods: Fiscal Year Ending
Amount
4/30/73
$14,771.66
4/30/74
9,822.27
4/30/75
7,045.68
4/30/76
8,420.00
Pension Trust
On June 29, 1971, the corporation created the "MARCUS WIGUTOW, M.D., INC., PENSION TRUST, [2] (the "Pension Trust"), naming Marcus as trustee. The Pension Trust Agreement provided *184 in pertinent part: WHEREAS, the Corporation desires to recognize the contribution made to its successful operation by its various employees and to reward such contribution by establishing a pension plan to provide retirement and death benefits for those of its employees who shall hereunder qualify as Participants under this Trust, and for the Beneficiaries designated by such employees…. NOW, THEREFORE, to place the aforesaid pension plan into effect and in consideration of the promises and the mutual covenants herein contained the Employer and the Trustees do hereby agree as hereinafter stated. * * * ARTICLE 3 CONTRIBUTIONS
3.1 The Employer shall contribute for each Plan Year [3] into the Trust… for the benefit of each Participant an amount equivalent to fifteeen (15%) per cent of such Participant's Compensation; [4] the aggregate annual contribution required for all Participants for each Plan Year shall, however, be reduced by those amounts, if any, pursuant to the provisions of Section 12.12, [5] during such year. The contribution herein prescribed shall be subject to the provisions of Section 11.2. * * * 3.3 The Annual contribution of the Employer, as prescribed *185 under Section 3.1 shall be based upon Compensation ascertained for the Plan Year in reference. 3.4 The allocation of the contributions of the Employer, as prescribed under Section 3.1 shall be made in accordance with Article 4. 3.5 Employer contributions as prescribed under Section 3.1 shall be determined for each Plan Year at the end thereof and shall be made not later than the time for filing the Federal Income Tax Return (plus any extensions of the filing date). * * * ARTICLE 4 PARTICIPANTS' ACCOUNTS
4.1 An Account shall be maintained for each Participant which shall evidence the Participant's share of the Trust Fund. The value of each Participant's Account shall be determined in accordance with the provisions of Section 4.2; said determination shall be made as of the end of each Plan Year and the value so determined shall be made as of the end of each Plan Year and the value so determined shall be that used with respect to any contingency that may have arisen during such Plan Year, except as otherwise provided under Article 11. 4.2 (A) Annually, as of the end of each Plan Year, the difference ascertained by subtracting (1) the aggregate value, excluding any *186 insurance contracts or annuity policies, of the Participants' Accounts as of the first business day of such year, from (2) the fair market value of the Trust Fund, excluding any insurance contracts or annuity policies, as of the last business day of such year shall be ratably allocated among all the Participants' Accounts as such prior account balance of each Participant bears to such aggregate prior account balances of all Participants. * * * (B) The adjustment of Accounts provided for under (A) herein shall only be made with respect to each Participant as of the date of each such adjustment to whose Account an allocation pursuant to (C) following herein had theretofore been made. (C) The contribution made by the Employer pursuant to Section 3.1 with respect to each Plan Year shall be allocated to the Accounts as of the end of each such year, but where applicable subsequent to the aplication of the provisions of (A) herein for the same Plan Year. Each Participant's Account shall be credited pursuant thereto with his share of the Employer's said contribution in accordance with his compensation as determined for said Plan Year under Section 3.3. * * * (E) The Trust Fund, *187 for the purpose of this Section, shall be deemed to mean all the assets of the Trust, other than (1) amounts contributed by the Employer which have not been allocated to the Participant's Accounts (such amounts shall be deemed the actual contribution, but not the fair market value thereof); and (2) the amount of forfeitures as aforesaid under Section 3.1 which has not been applied to reduce the Employer's contributions as required under Section 3.1. 4.3 The maintenance of an account for each Participant shall not be deemed to preclude the commingling of Trust Fund assets for investment purposes, except where this Agreement specifically provides otherwise. * * * 11.2 The Employer has established the Plan with the bonafide intention and expectation that from year to year it will be able to and will deem it advisable to make its contributions as herein provided; however, the Employer realizes that circumstances not now forseen (sic) or beyond its control may make it either impossible or inadvisable to continue to make its contributions as herein provided; therefore, the Employer does not assume such a contractual obligation. * * * 11.3 In the event the Employer decides *188 that it is impossible or inadvisable to continue to make its contributions as herein provided, the Employer shall terminate the Plan by notifying the Trustees in writing who in turn will advise the Participants. The Plan shall terminate automatically should the Employer be dissolved or declared bankrupt, or upon a complete discontinuance of contributions, or should the Employer lose its identity by acquisition or by merger, consolidation or reorganization whereby such successor in business does not assume the liabilities of this Plan and Trust. The Account of any Participant who is not [employed] by such successor shall fully vest and shall be distributed to the Participant or his Beneficiary, if applicable, in accordance with Section 7.3. [6]
*189 The District Director of Internal Revenue at Indianapolis, Indiana, sent a letter dated September 16, 1971, to the corporation stating in part that as of that date the Pension Trust was qualified under section 401 or section 405 and was exempt from taxation under section 501(a). However, Marcus' operation and administration of the Pension Trust caused it, during all relevant times, not to be qualified under section 401 or section 405, or exempt from taxation under section 501(a). [7]
While employed by the corporation, only the following employees were eligible to participate in and, in fact, participated in the Pension Trust: Marcus Wigutow, Judith Lammons, Kathleen McClanahan, and Joyce Larsen. Although the Pension Trust provided that an account be maintained for each participant to evidence the *190 participant's share of the trust fund, at all relevant times, separate accounts for the participants were not maintained on the books and records of the Pension Trust. Of those employees of the corporation who participated in the Pension Trust, the following terminated their employment with the corporation, and were paid from the Pension Trust the following amounts: Termination
Date of
Employee
Date
Payment
Payment
Kathleen McClanahan
09/73
$1,602.28
10/73
828.76
10/76
Judith Lammons
04/74
2,591.38
04/74
Joyce Larsen
10/76
2,915.30
10/76
During its fiscal year ending April 30, 1973, the corporation made contributions to the Pension Trust in the total amount of $11,109.13 and deducted this amount on its return for that period. During the following fiscal years, the corporation paid the premiums for two whole-life insurance policies on the life of Marcus, which policies were owned by the Pension Trust, and deducted the following amounts of premiums on its returns: Fiscal Year Ending
Amount
4/30/74
$103.28
4/30/75
454.25
4/30/76
558.79
During calendar year 1972, the corporation contributed $11,719.29 to the *191 Pension Trust. Marcus and Rose did not report this amount on their joint Federal income tax return for the calendar year 1972. During the following calendar years, the corporation paid the following amounts for premiums on the two whole-life insurance policies on the life of Marcus owned by the Pension Trust: Year
Amount
1973
$103.28
1974
454.25
1975
558.79
Marcus and Elizabeth did not report these amounts on their respective joint Federal income tax returns for the calendars years 1973, 1974, and 1975.
The balance sheets on the corporation's tax returns for the years in issue show the following. FYE
FYE
FYE
FYE
FYE
4/30/72
4/30/73
4/30/74
4/30/75
4/30/76
Net Worth
$4,149.74
$7,804.97
$8,204.77
$20,202.48
$31,132.83
Retained
Earnings
3,149.74
6,804.97
7,204.77
19,202.48
30,132.83
These returns, as adjusted for items the corporation agreed to in the statutory notice, also indicate the following: FYE
FYE
FYE
FYE
4/30/73
4/30/74
4/30/75
4/30/76
Net Profit Before
Salaries, etc.
$89,560.70 $81,150.66 $109,416,81 $140,201.23 Salary to Marcus
(60,000.00)
(56,099.47)
(72,708.48)
(75,254.68)
Salaries to other
employees
(20,267.45)
(18,780.59)
(18,618.93)
(45,042.79)
Net profit
(taxable income)
$ 9,293.25 $ 6,270.60 $ 18,089.40 $ 19,903.76 *192 Respondent sent separate notices of deficiency to the various petitioners herein. With respect to the Medical Expense Plan reimbursements, respondent determined that they were not deductible by the corporation, were not excludable from the individual petitioners' incomes, and did not qualify as earned income under sections 1348 and 911(b). [8] With respect to the contributions to the Pension Trust, respondent determined that they were not deductible by the corporation and were taxable to the individual petitioners. The individual petitioners now concede that the Pension Trust contributions are taxable income to them, but argue that these contributions constitute earned income under section 1348, not constructive dividends as determined by respondent. OPINION I. Medical Expense Plan
Generally, section 105 excludes from an employee's income medical expense reimbursements from his employer under a "health plan for employees." [9] Concomitantly, *193 if the reimbursements are excludable from the employee's income under section 105, generally they are also deductible by the employer as ordinary and necessary business expense under section 162(a).[10] Petitioners and respondent disagree as to whether the corporation's medical expense reimbursements qualify under section 105. *194 The parties agree that the corporation's reimbursements are amounts expended for medical care within the meaning of sections 105(b) and 213, but they disagree as to whether the tests of section 105(e) have been met. Section 105(e) requires first, that the benefits be received under a "plan," and second, that the plan be "for employees" rather than for some other class of persons such as shareholders and their relawtives. Larkin v. Commissioner, 48 T.C.. 629, 635 (1967), affd. 394 F. 2d 494 (1st Cir. 1968).See also American Foundry v. Commissioner,59 T.C. 231, 242 (1972), affd. in part and revd. in part 536 F. 2d 289, 293-294 (9th Cir. 1976). Where the participants in the plan are also shareholders, the test for deciding whether the plan is "for employees" rather than "for shareholders" is * * * whether the expected benefits of the plan are to be paid with respect to the individual's capacity as an employee of the corporation and whether there is any rational basis other than ownership to differentiate that individual from other employees. American Foundry v. Commissioner,536 F. 2d 289, 294 (9th Cir. 1976), *195 affg. in part and revg. in part 59 T.C.. 231 (1972). Thus, while a plan for employees can be for as few as one employee, there must be some "rational basis" other than ownership of the corporation to discriminate among employees. American Foundry v. Commissioner,supra,536 F. 2d at 293; Levine v. Commissioner,50 T.C. 422, 427 (1968); sec. 1.105-5(a), Income Tax Regs.[11] We conclude that the corporation's medical expense plan in this case is both a "plan" and "for employees." *196 First, it is clear that a plan existed when Marcus received the reimbursements from his corporation. The corporation adopted a written medical benefit plan identifying who was eligible to participate, what expenses would be reimbursed, and how participants were to make claims for reimbursement. Although the corporation had sole discretion to judge the timeliness and substantiation of claims and to determine which additional employees, if any, would be allowed to participate in the future, this discretion, expressly provided for under the terms of the plan, does not negate the existence of a "plan" under section 105(e). Nor does the plan's revocability make any difference. All noncontractual employee fringe benefits are revocable, but that does not negate the existence of a plan of employee fringe benefits. The pertinent regulation does not even require a written plan, such as we have here, nor does it require enforceable employee rights under the plan, so long as the participant has notice or knowledge of the plan. Section 1.105-5(a), Income Tax Regs. See footnote 11. Since Marcus signed the document declaring the Medical Expense Plan, both as president and as participant-employee, *197 he plainly had knowledge of the existence of the plan. The cases upon which respondent relies for the proposition that "discretionary, adhoc payments do not constitute a plan," are clearly distinguishable on their facts. In those cases, there were little or no written records of a plan, no cogent evidence of a specific intent to pay employee medical expenses, and insufficient evidence to establish that the participant-employees had knowledge or notice of the existence of the alleged plan. [12] This case is, on all three points, quite different and does not involve adhoc benefit payments. *198 We are also persuaded that the corporation's medical plan was for Marcus as an employee, not as a shareholder. That Marcus was the sole shareholder and sole participant does not automatically disqualify the plan. The pertinent regulation clearly contemplates a plan for the benefit of a single employee. Section 1.105-5(a), Income Tax Regs., provides in pertinent part: A plan may cover one or more employees, and there may be different plans for different employees or classes of employees. In several memorandum opinions of this Court, we have sustained plans in favor of officers who were also shareholders because of those officers' central management roles. [13] Also in Larkin v. Commissioner,supra, 48 T.C. at 635, n. 5., we recognized that "stockholder employees may well [constitute] a natural category of employees sufficient to indicate that the genesis of the plan was the employee rather than the stockholder relationship." Recently, in another memorandum opinion, we sustained a plan that covered only the sole shareholder noting that "his duties clearly distinguished him as a key employee." [14] Marcus' status as a key employee in the instant case *199 is even more compelling. Except for a brief nine and one-half month period during 1975, Marcus was the only licensed physician employed by this Indiana professional corporation. In Indiana, a professional corporation "may render professional medical service only through officers, employees, and agents who themselves hold an unlimited license to practice medicine in the state of Indiana." Ind. Code Ann. § 23-1-14-13 (Burns 1972). Indiana law permits the rendition of medical services through paraprofessionals such as Judith Lammons and Sharon Griegor.However, that is because they are excluded from the definition of employees rendering professional medical services so long as they are "under the direct supervision and control of an officer, agent or employee who is himself rendering professional medical service to the public on behalf of the *200 corporation." Ind. Code Ann. § 23-1-14-13, supra. Thus, without Marcus, the corporation simply could not have conducted its professional medical services business. Respondent argues that the corporation's employment of Dr. Divcic during 1975 shows that Marcus was not a key employee. We disagree. First of all, the corporation's medical plan was adopted on June 10, 1971, almost four years before Dr. Divcic began working for the corporation. This time gap diminishes the probative value of Dr. Divcic's exclusion from the plan. Second, Dr. Divcic was employed by the corporation for only part of 1975, while Marcus was employed for the entire year. Thus, based on time-service alone, Marcus' services were more important and valuable to the corporation than those of Dr. Divcic. Third, whatever the circumstances of Dr. Divcic's hiring and termination, there are rational grounds for excluding him from the medical plan. If Dr. Divcic was contemplated from the outset as only a temporary employee, his exclusion from the plan was clearly justifiable--it is reasonable for an employer to limit "key employee" benefits to permanent employees. If Dr. Divcic was intended for permanent (or *201 at least indefinite) employment, it was reasonable to postpone his participation until it appeared that he would, in fact, remain indefinitely. Many employer fringe benefit plans, in fact, require longer than nine and one-half months for eligibility.[15] Finally, in addition to being employed as a psychiatrist, Marcus was also the corporation's president, treasurer, and one of its directors. Dr. Divcic was not an officer of the corporation. Marcus' additional managerial and administrative duties also provide a "rational basis" for differentiating between Marcus and Dr. Divcic. In the spring of 1973, Marcus was recuperating from gunshot wounds and was unable to work. Respondent argues that since there is no evidence in the record that the corporation's business did not decrease during this period, we must conclude that the services of the paraprofessionals, Ms. Lammons and Ms. Griegor, were equally as important to the corporation *202 as those of Marcus. Again, we disagree. Even assuming that these paraprofessionals managed to keep the corporation's business going during Marcus' absence, they were nonetheless subject to Marcus' supervision and control. Marcus remained responsible, both as a physician-employee and as owner of the corporation, for the actions of these individuals. Petitioners are not suggesting that the other employees' services are insignificant or unimportant, nor would we so conclude. Petitioners simply argue, and we agree, that Marcus' services were much more important to the corporation than those of the other employees, and that this is a "rational basis" other than stock ownership upon which to exclude the other employees from participation in the medical plan. The cases upon which respondent relies, one published opinion and three memorandum opinions of this Court, are distinguishable on their facts. In Larkin v. Commissioner,supra, there was a serious question as to whether a plan existed at all, but any "plan" covered the two shareholders, their parents, and one shareholder officer. While the shareholders may have been key employees, their parents were not. The one *203 nonshareholder-employee who participated was apparently added sometime after the inception of the plan, and the benefits he received were different from those received by the shareholder-officers and their parents. Moreover, benefits were paid to dependents of the shareholders even though the scanty written evidences of the plan (corporate resolutions) did not cover these dependents. None of these factors is present in the instant case. In Estate of Leidy v. Commissioner,T.C. Memo. 1975-340, affd. without published opinion 549 F. 2d 798 (4th Cir. 1976), the corporation adopted a plan that initially covered only the two shareholders, Leidy and his mother. She later ceased being a shareholder. Although both were employees, only Leidy could in any way be characterized as a key employee.Subsequently, the plan was amended to provide limited coverage for additional employees, but only Leidy and his mother continued to receive unlimited coverage. The mother's unlimited coverage continued despite the fact that because of her advancing age she later rendered only nominal, if any, services to the corporation. Also, the initial plan was adopted just a few *204 days after Leidy was informed by his doctor that he suffered from a heart condition that would require increasing medical care. Coupling this with the advanced age of Leidy's mother, we inferred that "the original plan was merely a device whereby the corporate earnings would be used to meet the anticipated medical needs of Leidy and his mother." 34 T.C.M. at 1479, 44 P-H Memo T.C. par. 75,340, at page 75-1443. Although somewhat similar to the present case in certain respects, Estate of Leidy is not controlling. A major fault of the Leidy plan was its inclusion of Leidy's mother, who was never a key employee of the corporation and who later rendered few, if any, services, but continued to receive her salary and her unlimited medical coverage. The inclusion of Leidy's mother left no basis for the plan's coverage other than her son's ownership of all of the stock.Here, Rose never worked for the corporation, and the payment of Rose's medical expenses, unlike those of Leidy's mother, was based on her status as Marcus' spouse, a derivative participation plainly contemplated both by the plan and by section 105(b). See footnote 9. A troublesome fact here is Rose's *205 pre-existing cancer condition, which respondent analogizes to Leidy's discovery of his heart condition. While Rose's benefits under her medical insurance ceased at some point between her original illness in 1968 and her death in 1972, we resist respondent's inference of a direct cause and effect relationship between that fact and the corporation's adoption of the medical plan, such as we found in Leidy. Here, the professional service corporation was not set up until 1971 and the health plan was adopted shortly after the incorporation. Moreover, there is no requirement in section 105 that a "health plan for employees" must exclude pre-existing medical conditions of employees and their dependents. We also think respondent relies too much upon our inference in Leidy of a plan to bail out corporate earnings for personal purposes. The medical expense reimbursements contemplated under section 105(b) are inherently personal, and the statute expressly excludes such reimbursements from income. We think the personal nature of these medical reimbursements is of little relevance in determining whether a section 105 plan is for employees. In Smithback v. Commissioner,T.C. Memo. 1969-136, *206 a plumber incorporated his sole proprietorship.He was the only full-time salaried employee, although the company also employed other plumbers. The factual record in the Smithback case was rather scant, and there was a serious question as to the existence velnon of any plan. Assuming there was such a plan, the Court concluded, 28 T.C.M. at 711, 38 P-H Memo. T.C. par. 69-136, at page 69-762: We understand the genesis and the primary purpose of the plan--indeed, of the incorporation of Edward's business--to have been the avoidance of Federal taxation, a purpose which obviously was to benefit Edward in his capacity as owner of the business rather than as employee. The Court went on to hold that the taxpayers * * * have failed to show the purpose of the assumed plan was to benefit employees. Thus, the result in the Smithback case turned upon a failure of proof. [16]
*207 Finally, in John H. Kennedy, Inc. v. Commissioner,T.C. Memo. 1977-210, an attorney, the sole shareholder of his professional service corporation, was the only participant in the corporation's purported medical plan. Although the "plan" defined eligibility in terms of length of service (two years), the shareholder was the only employee ever to qualify. We held in that case that there was no "plan," and further concluded that if there was a plan its purpose was to benefit the taxpayer as the sole shareholder. We do not read that case as holding that there cannot be a qualifying health plan for a single employee-shareholder. On the contrary, the pertinent regulation specifically provides that a plan can exist for a single employee. Section 1.105-5(a), Income Tax Regs. Neither the statute nor the regulation requires that all employees be covered under some sort of plan before a different plan for the benefit of an employee-shareholder will be recognized under section 105. We shall not legislate this as a mandatory requirement; at most, it is but one factor to consider. With respect to the years before us, Congress had not legislated to deny the benefits of *208 section 105 to incorporated proprietorships or to professional service corporations. [17] Also, with respect to the years before us, Congress had not yet legislated to impose any nondiscrimination requirement as to health plans for employees.[18] The formal requirements for such a plan under section 105(e) were comparatively liberal under the law governing this case. As the Ninth Circuit observed in American Foundry v. Commissioner,supra,536 F. 2d at 294: We note that the "rational basis" test for creating subclasses of employees is not nearly as strict as the nondiscrimination requirements applicable to qualified pension and profit-sharing plans. The statute is silent, but the legislative history is instructive. The original House version of § 105 contained strict nondiscrimination rules. See H. Rep. No. 1337, 83d Cong., 2d Sess. 15 (1954); 3 U.S. Code Cong. & Adm. News p. 4039 (1954). The Senate Finance Committee deleted those provisions and the Senate version was adopted. H. Rep. No. 2543, 83d Cong., 2d Sess. 24-25 (1954), 3 U.S. Code Cong. & Admin. News p. 5283 (1954). * * * See also Larkin v. Commissioner,supra, 48 T.C. at 635, n. 5; *209 Lang v. Commissioner,supra,41 T.C. at 356, n. 5. Based on the law as it existed during the years involved in this case and based on all of the facts of this case, especially Marcus' paramount status as the key employee of his professional service corporation, we hold that the medical expense reimbursements were excludable from the individual petitioners' incomes under section 105 and deductible by the corporate petitioner under section 162(a). [19]
*210 II. Pension Trust
A. Deductibility by Corporation
In 1971, the corporation instituted a Pension Trust, intending it to qualify under section 401. During the years in issue, the trust was not qualified. The parties agree that the contributions to the nonqualified Pension Trust are thus includable in petitioners' gross income, but they disagree as to the deductibility by the corporation of its contributions to the trust. The parties further agree that since the corporation's contributions were made pursuant to a nonqualified plan of deferred compensation, they are deductible, if at all, solely under section 404(a)(5). Section 404(a)(5) provides: (a) General Rule.--If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either f such sections, they shall be deductible *211 under this section, subject, however, to the following limitations as to the amounts deductible in any year: * * * (5) Other Plans.--If the plan is not [a qualified plan under section 401], in the taxable year in which an amount attributable to the contribution is includible in the gross income of employees participating in the plan, but, in the case of a plan in which more than one employee participates only if separate accounts are maintained for each employee. Thus, the deduction by the employer is postponed until the employer's taxable year with which or within which ends the employee's taxable year in which the contributions are taxable to the employee. Section 1.404(a)-12(b)(1), Income Tax Regs.[20] However, where more than one employee participates in the plan, as in this case, "separate accounts" must be maintained for each employee. Section 404(a)(5). Here, the Pension Trust kept no separate accounts upon its books and records, and respondent accordingly determined that no deduction was allowable. Section 1.404(a)-12(b)(3), Income Tax Regs., describes this "separate *212 accounts" requirement as follows: (a) Separate accounts for funded plans with more than one employee. In the case of a funded plan under which more than one employee participates, no deduction is allowable under section 404(a)(5) for any contribution unless separate accounts are maintained for each employee. The requirement of separate accounts does not require that a separate trust be maintained for each employee. However, a separate account must be maintained for each employee to which employer contributions under the plan are allocated, along with any income earned thereon. In addition, such accounts must be sufficiently separate and independent to qualify as separate shares under section 663(c). Nothing shall preclude a trust which loses its exemption under section 501(a) from setting up such accounts and meeting the separate account requirement of section 404(a)(5) with respect to the taxable years in which such accounts are set up and maintained. Citing this regulation's reference to the "separate share" rule of section 663(c) and a regulation under section 663(c) [21] providing that separate accounts for each share need not be maintained in the trust's books and *213 records, petitioners argue that the "separate accounts" requirement is met because, under the Pension Trust, each participant's share can be determined at any given moment from the plan's benefit and contribution formulae. We disagree. The provision for "separate accounts" is an express statutory requirement of section 404(a)(5). The cross-reference to section 663(c) in the above-quoted regulation appears in the regulation, not in the statute. The statutory language "only if separate accounts are maintained for each employee" connotes written documentation in the trust's records of the segregation of the participant's benefits. Moreover, section 1.404(a)-12(b)(3), Income Tax Regs., quoted above, in referring to separate accounts being "maintained" or "setting up such accounts," envisions that this separate accounting be reflected in writing in the trust's *214 books and records. We do not attach the significance that petitioners do to the cross-reference in the regulation to section 663(c). Section 663(c) expressly states that the "separate share" rule is "[f]or the sole purpose of determining the amount of distributable net income in the application of sections 661 and 662…." With a nonqualified plan, such as we are dealing with, the trust is taxable on its earnings and the beneficiaries are taxable on trust distributions. The "separate share" rule of section 663 serves to limit both the trust's deduction under section 661 and the participant's recognition of income under section 662 to each participant's aliquot share of the trust's distributable net income. See Rev. Rul. 74-299, 1974-1 C.B. 154. The general test for separate and independent shares under section 663(c) is "whether distributions of the trust are to be made n substantially the same manner as if separate trusts had been created." Section 1.663(c)-3(a), Income Tax Regs. The benefit and contribution formulae of a plan such as the Pension Trust in this case would appear to satisfy this "separate share" requirement. [22] Indeed, a failure to satisfy the *215 separate share rule of section 663(c), by failing to provide sufficiently defined and segregated benefits and rights for employees, may well result in a finding that there is no "plan" under Subchapter D. Compare Engineered Timber Sales, Inc. v. Commissioner,74 T.C. 808 (1980). On the other hand, we do not believe that a finding of "separate shares" under section 663 satisfies the "separate accounts" requirements of section 404(a)(5). Section 1.404(a)-12(b)(3), Income Tax Regs., quoted above, treats the separate share rule of section 663(c) as a requirement in addition to the separate accounts rule, not as an element of the separate accounts rule or as an example of it. Moreover, as noted above, the existence of a "plan" will often satisfy the separate share rule. In any event, the very language of the above regulation--"In addition, such accounts *216 must be sufficiently separate and independent to qualify as separate shares under section 663(c)"--indicates that something other than the "separate shares" test must be satisfied to meet the "separate accounts" requirement. To accept petitioners' argument that adequate identification of the separate shares in the plan satisfies the separate accounts requirement of section 404(a)(5) is to read the separate accounts language out of the statute. We will not do that. Accordingly, we conclude that "separate accounts," as used in section 404(a)(5), requires separate accounts maintained on the books and records of the trust. Since the Pension Trust failed this requirement, the corporation's contributions to that trust are not deductible. B. Earned Income or Dividends
The individual petitioners now concede that they are taxable on the corporation's contributions to the nonqualified pension plan during these years, but contend that such contributions are earned income, qualifying for the 50 percent maximum tax rate provided in section 1348, rather than constructive dividends as determined by respondent. As in effect during the years in issue, section 1348(b)(1) defined "earned *217 income" as follows: The term "earned income" means any income which is earned income within the meaning of section 401(c)(2)(c) or section 911(b), except that such term does not include * * * any deferred compensation within the meaning of section 404. For purposes of this paragraph, deferred compensation does not include any amount received before the end of the taxable year following the first taxable year of the recipient in which his right to receive such amount is not subject to a substantial risk of forfeiture (within the meaning of section 83(c)(1)). The parties seem to agree that since the Pension Trust contributions were includable in the individual petitioners' incomes in the years the contributions were made, these contributions do not constitute "deferred compensation" within the meaning of section 1348(b)(1). See section 1.1348-3(b)(2), Income Tax Regs.[23] Section 911(b) defines "earned income" as: * * * wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which *218 represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. Thus, only reasonable compensation for services actually rendered qualifies for the section 1348 "maxitax." Unreasonable compensation under section 162(a)(1) standards does not qualify as earned income under section 1348. Kennedy v. Commissioner,72 T.C. 793, 805-806 (1979), revd. on other grounds 671 F. 2d 167 (6th Cir. 1982). [24]
*219 "Reasonable compensation" means compensation that is actually intended to be paid for the services actually rendered and that is reasonable for those services. Section 1.162-7, Income Tax Regs.; Nor-Cal Adjusters v. Commissioner,503 F. 2d 359, 362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1340 (1971), affd. without opinion 496 F. 2d 876 (5th Cir. 1974); Klamath Medical Service Bureau v. Commissioner,29 T.C. 339, 347 (1957), affd. 261 F. 2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). Discerning the intent behind the compensation presents a question of fact, to be determined from all the facts and circumstances of the particular case. Paula Construction Co. v. Commissioner,58 T.C. 1055, 1059 (1972), affd. without opinion 474 F. 2d 1345 (5th Cir. 1973); Electric & Neon, Inc. v. Commissioner,supra.Petitioners have the burden of proof. Rule 142(a); Paula Construction Co. v. Commissioner,supra,58 T.C. at 1058; Electric & Neon, Inc. v. Commissioner,supra. *220 Respondent contends that the contributions to the Pension Trust were not intended as compensation. We disagree. A pension plan such as that involved here is, generally, a method of compensating employees for their services. Moreover, the contribution formula in the Pension Trust is stated as a percentage of employee remuneration (basically salaries). [25]
We do not view as significant the statement in the corporation's minutes of April 10, 1973, to the effect that Marcus' "total compensation" for the year was $60,000. The Pension Trust was instituted almost two years before the 1973 meeting. Moreover, we believe this statement is merely in the context of salary. Indeed, it is notable that these same minutes authorize contributions to the Profit Sharing and Pension Trusts. The preamble to the Pension Trust *221 Agreement itself provides: [T]he Corporation desires to recognize the contribution made to its successful operation by its various employees and to reward such contribution by establishing a pension plan to provide retirement and death benefits for those of its employees who shall hereunder qualify * * *. Nor do we believe that the employment agreement between Marcus and the corporation on June 9, 1971, establishes that his $50,000 salary and his bonus constitute the whole extent of the compensation intended for him. Here, the context is even more clearly limited to salary and bonuses. Moreover, the Pension Trust was executed less than three weeks after the Employment Agreement, and both were executed within five weeks of the formation of the corporation. Finally, the fact that none of the participants reported in their incomes the Pension Trust contributions is immaterial in this case. At the time the contributions were made, the participants had reason to believe that the Pension Trust was qualified under section 401, so that the contributions would not have been taxable at that time to the participants. See section 402(a).We conclude that the Pension Trust contributions *222 were intended as compensation to Marcus and the other participants for their services. The reasonableness of the compensation amount is also a factual question to be resolved on the basis of the record in each individual case. Charles Schneider & Co. v. Commissioner,500 F. 2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); Pacific Grains, Inc. v. Commissioner,399 F. 2d 603, 605 (9th Cir. 1968), affg. a Memorandum Opinion of this Court; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977); Pepsi-Cola Bottling Co. of Salina v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F. 2d 176 (10th Cir. 1975); Boyle Fuel Co. v. Commissioner,53 T.C. 162 (1969). The factors generally considered relevant in determining the reasonableness of compensation include: * * * the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison *223 of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.] Pepsi-Cola Bottling Co. of Salina v. Commissioner,supra,61 T.C. at 567-568; Dahlem Foundation, Inc. v. Commissioner,54 T.C. 1566, 1579 (1970). See also Hammond Lead Products, Inc. v. Commissioner,425 F. 2d 31, 33 (7th Cir. 1970), affg. a Memorandum Opinion of this Court. We must evaluate the entire situation of the instant case in light of all of the above factors, but no single factor is determinative. Mayson Mfg. Co. v. Commissioner,supra.Petitioners bear the burden of proof. Rule 142(a); Kennedy v. Commissioner,supra,72 T.C. at 802. We conclude that the Pension Trust contributions, when combined with *224 his other compensation from the corporation, are reasonable amounts of compensation to Marcus. First, as noted above, in connection with the Medical Plan, for most of the period in question, Marcus was the only physician employed by the corporation, and thus, the only person through whom the corporation could conduct its psychiatric business. And even during the short period in 1975 when the corporation employed another physician, Marcus had management obligations as president and treasurer that Dr. Divcic did not have. Moreover, as a licensed psychiatrist, Marcus was highly educated and trained for his calling. Even including the pension contributions, the amounts do not seem unreasonable: [26]
FYE 4/30/73
FYE 4/30/74
FYE 4/30/75
FYE 4/30/76
Salary & Bonus
$60,000.00
$56,099.47
$72,708.48
$75,254.68
Pension contributions
11,109.13
103.28
454.25
558.79
Total Compensation
$71,109.13
$56,202.75
$73,162.73
$75,813.47
*225 Although other cases have viewed a large discrepancy between shareholder salaries and nonshareholder salaries as a factor indicating unreasonableness, we do not believe this is appropriate in this case because of the small number of total employees and the manner in which an incorporated medical practice produces its income. Nor do we give much weight to the absence of dividends in this case. There was no parallel between increases in retained earnings and increases in Marcus' compensation, and, the corporation's retained earnings were fairly sizeable. Even after taking into account our determination that the Pension Trust contributions are not deductible by the corporation, we find no correlation between the amounts of the contributions and (1) the corporation's retained earnings or increases thereto; (2) net worth or increases thereto; and (3) net profit, before or after salaries and compensation, or additions thereto. The record does not evidence any sort of plan to bail out the corporation's earnings and profits in the guise of Pension Trust contributions. Cf. Klamath Medical Service Bureau v. Commissioner,supra.Accordingly, based on all the facts, *226 we conclude that the Pension Trust contributions constitute reasonable compensation for the services Marcus actually performed, and thus, qualify as earned income. [27]
III. Conclusion
To summarize, we have concluded: (1) that the medical expense reimbursements are excludable from the individual petitioners' incomes under section 105 and are deductible by the corporation under section 162(a); and (2) that the Pension Trust contributions are not deductible by the corporation under section 404(a)(5), but do qualify as earned income to Marcus thus entitling Marcus to the maximum tax rate under section 1348. To reflect these holdings and petitioners' acceptance of certain adjustments in the statutory *227 notice, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question and all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
2. The corporation also created the "MARCUS WIGUTOW, M.D., INC., EMPLOYEES' PROFIT SHARING TRUST" on the same day, again naming Marcus as trustee. The tax consequences to the corporation and to Marcus of the corporation's contributions to the Profit Sharing Trust are not at issue in this case. ↩
3. The Plan Year was the corporation's fiscal year ending April 30. ↩
4. Section 1.13 of the Pension Trust Agreement defines "Compensation" as follows: (A) "Compensation" shall be deemed to mean the total annual remuneration paid by the Employer to the Employee for the Plan Year in reference, subject to the following subdivision of this this section. (B) Annual remuneration, as used under (A) herein, shall not include the following: (1) contributions made by the Employer under this Plan; (2) contributions made by the Employer under any other Plan or arrangement providing welfare or retirement benefits; (3) amounts paid as reimbursement of expenses, or as an allowance for expenses, attributed to the employment with the Employer, without regard as to whether such amounts are subject to Federal Income Tax. Otherwise, annual remuneration shall be deemed that remuneration which would have been reportable on U.S. Treasury Department Form W-2 for the Plan Year in reference had such form been rendered on a Plan Year basis. ↩
5. The incomplete copy of the Pension Trust Agreement introduced into evidence does not contain section 12.12. ↩
6. Section 7.3 deals with distribution of a participant's account upon his termination from the corporation's employment.↩
7. One of the reasons the Pension Trust was not qualified was because on or about August 8, 1972, Marcus withdrew $10,000 from the Pension Trust. Marcus gave in return an installment note in the principal amount of $10,000 payable at $1,200 per month with interest at the rate of five percent per annum. During all relevant times, Marcus had not made any payments on that note.↩
8. Respondent concedes that if the medical expense reimbursements are not excludable under section 105, the individual petitioners are entitled to medical expense deductions under section 213↩, subject to the limitations therein.
9. Section 105 provides in pertinent part: SEC. 105. AMOUNTS RECEIVED UNDER ACCIDENT AND HEALTH PLANS. (a) Amounts Attributable to Employer Contributions.-- Except as otherwise provided in this section, amounts received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income to the extent such amounts (1) are attributable to contributions by the employer which were not includible in the gross income of the employee, or (2) are paid by the employer. (b) Amounts Expended for Medical Care.-- Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include amounts referred to in subsection (a) if such amounts are paid, directly or indirectly, to the taxpayer to reimburse the taxpayer for expenses incurred by him for the medical care (as defined in section 213(e)) of the taxpayer, his spouse, and his dependents (as defined in section 152). * * * (e) Accident and Health Plans.--For purposes of this section and section 104-- (1) amounts received under an accident or health plan for employees, and (2) amounts received from a sickness and disability fund for employees maintained under the law of a State, a Territory, or the District of Columbia, shall be treated as amounts received through accident or health insurance. ↩
10. See sec. 1.162-10(a), Income Tax Regs.; Giberson v. Commissioner,T.C. Memo. 1982-338; Epstein v. Commissioner,T.C. Memo. 1972-53; Smith v. Commissioner,T.C. Memo. 1970-243; Bogene, Inc. v. Commissioner,T.C. Memo. 1968-147. However, the non-excludability of the medical payments under section 105 does not preclude a deduction under section 162(a)(1), if the tests for reasonable compensation are otherwise met.See American Foundry v. Commissioner,59 T.C. 231, 243-245 (1972), affd. in part and revd. in part, 536 F. 2d 289 (9th Cir. 1976); Charlie Sturgill Motor Co. v. Commissioner,T.C. Memo. 1973-281↩, vacated and remanded by stipulation (6th Cir. 1975).
11. Section 1.105-5(a), Income Tax Regs., provides in pertinent part: In general, an accident or health plan is an arrangement for the payment of amounts to employees in the event of personal injuries or sickness. A plan may cover one or more employees, and there may be different plans for different employees or classes of employees. An accident or health plan may be either insured or noninsured, and it is not necessary that the plan be in writing or that the employee's rights to benefits under the plan be enforceable. However, if the employee's rights are not enforceable, an amount will be deemed to be received under a plan only if, on the date the employee became sick or injured, the employee was covered by a plan (or a program, policy, or custom having the effect of a plan) providing for the payment of amounts to the employee in the event of personal injuries or sickness, and notice or knowledge of such plan was reasonably available to the employee.↩ (Emphasis added.)
12. See Larkin v. Commissioner,394 F. 2d 494, 495 (1st Cir. 1968), affg. 48 T.C. 629 (1967); Chism's Estate v. Commissioner,322 F. 2d 956, 961-962 (9th Cir. 1963), affg. T.C. Memo. 1962-6; Lang v. Commissioner,41 T.C. 352, 353, 356-358 (1963); Estate of Kaufman v. Commissioner,35 T.C. 663, 666-667 (1961), affd. 300 F. 2d 128 (6th Cir. 1962); Bongiovanni v. Commissioner,T.C. Memo. 1976-131, affd. without published opinion 556 F. 2d 584↩ (7th Cir. 1977).
13. See Epstein v. Commissioner,T.C. Memo. 1972-53; Seidel v. Commissioner,T.C. Memo. 1971-238; Smith v. Commissioner,T.C. Memo. 1970-243; Bogene, Inc. v. Commissioner,T.C. Memo. 1968-147↩. 14. See Giberson v. Commissioner,T.C. Memo. 1982-338↩.
15. Delayed participation is permissible even under the strict requirements of qualified deferred compensation plans. See e.g., sec. 410(a)(1). See also Rev. Rul. 69-421, Part 4(e), 1969-2 C.B. 59↩, 70. (Pre-ERISA law.)
16. As the law has subsequently evolved in regard to section 105 health plans for employees, one may question whether a taxpayer's purpose in structuring his business to qualify for plainly permissible tax benefits should be used to disallow those benefits. See footnotes 17 and 18 below. Both employees and business owners may possess the desire to avoid taxes, and, to the extent that the tax laws permit, both may structure their affairs to minimize their tax liabilities. See Gregory v. Helvering,293 U.S. 465 (1935). In any event, the record in the present case is singularly devoid of the sort of explicit evidence of an intent to avoid taxes that influenced the Court in Smithback.↩
17. But see section 269A, enacted by the Tax Equity and Fiscal Reform act of 1982, Pub. L. 97-248, sec. 250, 96 Stat. 324, 528-529, applicable to taxable years beginning after December 31, 1982.Nor has respondent sought to reallocate expenses and deductions between Marcus and the corporation under sections 61 (assignment of income), 269, and 482. See Achiro v. Commissioner,77 T.C. 881 (1981); Keller v. Commissioner,77 T.C. 1014 (1981), on appeal (10th Cir. April 2, 1982). Compare Foglesong v. Commissioner,T.C. Memo. 1976-294, rev. 621 F. 2d 865 (7th Cir. 1980), on remand 77 T.C. 1102 (1981), revd. and remanded 691 F. 2d 848↩ (7th Cir. 1982). 18. We express no opinion as to whether the medical reimbursement plan in this case would satisfy the nondiscrimination requirement of section 105(h), effective for claims filed and paid in taxable years beginning after December 31, 1979. See section 366, Revenue Act of 1978, Pub. L. 95-600 (1978), 92 Stat. 2855-2856; 1978-3 C.B. 1↩, 89-91. 19. Accordingly, we need not address petitioners' alternative contentions under American Foundry v. Commissioner,59 T.C. 231 (1972), affd. in part and revd. in part 536 F. 2d 289↩ (9th Cir. 1976), as to reasonable compensation, and under section 1348 as to earned income for purposes of the maximum tax.
20. Allied Investment Credit Corp. v. Commissioner,T.C. Memo. 1975-2↩.
21. Section 1.663(c)-1(c), Income Tax Regs., provides: The separate share rule may be applicable even though separate and independent accounts are not maintained and are not required to be maintained for each share on the books of account of the trust, and even though no physical segregation of assets is made or required.↩
22. In light of our holding on the "separate accounts" requirement of section 404(a)(5), we need not decide whether this Pension Trust satisfies the "separate share" rule of section 663(c). But see section 1.663(c)-3(b), Income Tax Regs.↩; 6 Mertens, Law of Federal Income Taxation, sec. 36.82, ch. 36 (1975 rev.).
23. Section 1.1348-3(b)(2), Income Tax Regs., provides in pertinent part: [A]ny amount includible in gross income as compensation before the end of the taxable year following the first taxable year of the taxpayer in which his right to receive such amount is not subject to any requirement or condition which would be treated as resulting in a substantial risk of forfeiture within the meaning of section 83 and the regulations thereunder does not constitute deferred compensation for purposes of section 1348 and the regulations thereunder. ↩
24. See also Kipnis v. Commissioner,T.C. Memo. 1982-471; Foos v. Commissioner,T.C. Memo. 1981-61; Schiff v. Commissioner,T.C. Memo. 1980-578↩.
25. We do not agree with respondent's suggestion that the Pension Trust Agreement's definition of compensation to exclude contributions to the Pension Trust indicates that the corporation did not intend the trust contributions as compensation. The contributions were measured as a percentage of "compensation," a figure that of necessity excludes those contributions.↩
26. The figures listed in the table in the text are from the corporation's returns. Because Marcus was on the calendar year basis, the figures for his salary and pension contributions differ as shown below: 1972
1973
1974
1975
Salary & Bonus
$70,000.00
$43,000.00
$79,469.93
$69,662.69
Pension Contributions
11,719.29
103.28
454.75
558.79
Total Compensation
$81,719.29
$43,103.28
$79,924.68
$70,221.48
We conclude that these amounts also constitute reasonable compensation for his services to the corporation. We note that the contributions of $103.28, $454.75, and $558.79 for the years 1973-1975 were insurance premiums on a policy on Marcus' life that was owned by the Pension Trust. The statutory notice increased Marcus' income by the amounts of $11,719.29, $103.28, $454.75, and $558.79.↩
27. Our holding that these contributions were reasonable compensation for services rendered moots respondent's argument that the Pension Trust should be disregarded as lacking economic reality. Even viewed as direct distributions by the corporation to Marcus, these amounts would still be reasonable compensation to him under the facts of this case. Moreover, the trust's economic reality is established by the contributions for and distributions to participants other than Marcus.↩